Kelly M. O'GILVIE, Individually and as Administrator of the Estate of Betty L. O'Gilvie, Deceased; and Stephanie L. O'Gilvie, a Minor, and Kevin M. O'Gilvie, a Minor, By and Through Kelly M. O'Gilvie, Their Father and Natural Guardian, Plaintiffs,

v.

INTERNATIONAL PLAYTEX, INC., a Corporation, Defendant.

No. 83–1846–K.

United States District Court, D. Kansas.

May 24, 1985.

Gerald L. Michaud and Mark B. Hutton, Wichita, Kan., for plaintiffs.

Larry Wall, Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., Charles M. McCaghey, Olwine, Connelly, Chase, O'Donnell & Weyner, New York City, for defendant.

## REMITTITUR OF PUNITIVE DAMAGES

PATRICK F. KELLY, District Judge.

On February 25, 1985, the jury unanimously responded to certain questions propounded by the Court as follows:

1. Was decedent Betty O'Gilvie, in late March 1983 and during the course of her menstrual cycle, using defendant's product?

    Yes _X_ No ___

2. In March 1983, did use of Playtex super deodorant tampons cause or contribute to the cause of toxic shock syndrome?

    Yes _X_ No ___

3. As compared to all other tampons, including competitors, is there an increased risk of contracting toxic shock syndrome when using these super deodorant tampons?

    Yes _X_ No ___

4. Did the label and instructions inside and outside the Playtex box at the time the product was being used by Betty O'Gilvie adequately and fairly inform and warn Betty O'Gilvie of the risk of TSS which may be fatal from using Playtex tampons?

    Yes ___ No _X_

5. Do you find International Playtex and/or Dr. Thomas Hays to be at fault in this case?

    Yes _X_ No ___

6. If you answer No. 5 "yes", then, considering all of the fault at 100%, what percentage of fault is attributable to each of the following:

| | | |
|---|---|---|
| International Playtex | (0 to 100%) | 80% |
| Dr. Hays (and his agents or employees) | (0 to 100%) | 20% |
| Total | | 100% |

7. Without considering the percentage of fault found in No. 6, what total amount of damages do you find should be awarded:

Conscious pain and suffering of Betty O'Gilvie — $250,000.00

Nonpecuniary loss (not to exceed $25,000.00) to Kelly O'Gilvie and children — 25,000.00

Pecuniary loss to Kelly O'Gilvie and children — 1,250,000.00

8. Did International Playtex know, or should it have known, of the increased risk of developing toxic shock syndrome when using Playtex super deodorant tampons at the time of the death of Betty O'Gilvie?

Yes  X   No ___

9. Was the failure of International Playtex to adequately warn about the increased risk of toxic shock syndrome with the usage of Playtex super deodorant tampons a reckless disregard by International Playtex of the consequences of its acts?

Yes  X   No ___

10. If your answer to No. 9 is "yes", you may assess punitive damages as you feel are warranted from the evidence.

Punitive damages — $10 million

On March 21, 1985, the Court took up defendant's motions, all of which were overruled. Specifically, the jury's assessment of punitive damages, while substantial, was found to be not excessive, nor did it shock the Court's conscience. In the Court's view, in light of the evidence and the jury's findings, the jurors expressed their "outrage" the only way they could—with money damages. Conversely, the jurors were actually saying, "Take that damnable product off the market!"

Following the Court's findings and rulings, the Court tendered a provocative proposition to the defendant. Speaking indirectly to the President of Beatrice Company, the parent company of defendant International Playtex, the Court commented in substance as follows:

That this person should know, that in the Court's view, there was ample evidence to support each finding of the jury; that punitive damages are essentially intended to deter wrongdoing; that in the event there are no changes contemplated by the defendant International Playtex, such damages as manifested by *this* jury are probably "only the beginning. There surely will be others!"

Further, the Court ventured that the President of Beatrice was probably an entirely decent person, and if he concurred with these findings, he would surely order a change.

The Court then represented to defendant's counsel that in the event this person, or his authorized representative, elected to appear in this Court on April 29, 1985, to acknowledge the jury's findings as factually established and announce the removal of the polyacrylate tampon from the marketplace, the Court in turn would consider a substantial reduction, if not elimination, of the punitive damages award.

The Court's tender of a reduction of any portion of the jury verdict on the basis of the conditions set forth was probably without precedent. This proposition was an innovative remedy geared to what the Court reasoned as "that which ought to be." In this, the Court has drawn from similar experiences in dealing with those persons who have appeared here for the purposes of punishment. In many instances the ordeal itself is punishment enough. In others, deterrence is paramount. When wrongdoing is acknowledged, where changed is agreed to, indeed, where change has occurred, the Court is usually impressed and persuaded principally as to what further punishment, if any, is then in order. In the Court's view, such remedial events are appropriate elements of mitigation which, in the Court's discretion, should be noted and considered.

Within two weeks of that hearing, the Court noted the defendant's public announcement to the effect that its Playtex Slender, Super and Super Plus Tampons—those containing polyacrylate fibers—will no longer be made. Shortly thereafter, defendant's counsel communicated with the

Court in the interest of further conference and for a continuance of the pending hearing. With the concurrence of plaintiffs' counsel, the Court conferred with counsel for International Playtex; the hearing was set over to May 24, 1985.

At the outset, the defendant's counsel were apprised that it has never been the Court's intention to negotiate or otherwise dictate the course of defendant's decisions. Indeed, whatever decisions were made by the defendant company, were its alone to make.

In the course of the first session, the defendant's counsel specifically represented that the defendant had indeed removed polyacrylate fibers from all tampons, and all tampons with polyacrylate fibers are being removed from the market. The Court discussed the present state of the warning on defendant's product which acknowledges an "association" between the use of the tampon and toxic shock syndrome (TSS). The jury found that this warning was inadequate and the Court concurs. Additionally, the Court took up the necessity of a broad-spread communication by the industry to the consuming public and the medical community with regard to early signs and symptoms of TSS.

As to the need for a public education program, the defendant's counsel have outlined a meaningful program which, given time and exposure, should serve to inform and alert the public and medical community about the toxic shock process.

With regard to the warning, defendant's counsel have represented to the Court that as of now the defendant's alert statement or any warnings with regard to the sale of any tampon will be modified to include the following:

There are scientific studies which have concluded that tampons contribute to the cause of TSS.

While some may argue as to the adequacy of this statement, all should agree that it represents a sizeable "first step." Indeed, the Court is the first to note the sense of sincerity exercised by defendant's counsel. The Court is ever sensitive to certain pragmatics of this action. Given misperception, it could surely be abused by some, either in the course of pending litigation here or elsewhere—and in future days! However unfortunate, it may well invite additional litigation. From the Court's perspective, however, the defendant's action represents a commendable exercise of fortitude and decency.

Of paramount importance, the Court finds that such action is a significant post-judgment remedial and mitigatory response to the jury's findings. Indeed, the jury's intent has been substantially sufficed. In view of the defendant's actions, the Court finds that the punitive damages award is now, in part, excessive and unnecessary. The jury's finding of ten million dollars ($10,000,000.00) is reduced to the amount of one million three hundred fifty thousand dollars ($1,350,000.00), effective from February 26, 1985. This remaining sum is intended to represent the jury's assessment regarding the element of punishment and is clearly the proprietary right of the plaintiffs. In the Court's view, such an amount is fair, reasonable and deserving. In light of defendant's action, the Court here asserts that International Playtex should not be called upon to respond in any punitive damage claims, at least with those matters pending here. It has faced its situation, it has acted most responsibly, and it has acted decently. It can be no further deterred; it has been punished enough!

Some comment is in order for the benefit of the plaintiff, Mr. Kelly O'Gilvie, for himself and on behalf of his children. Following the jury's verdict, they enjoyed the expectancy of a substantial recovery. Yet, they did not bring this action for personal enrichment. They sought punitive damages solely to punish and deter the defendant from future wrongdoing. In the face of defendant's announcements and representations, the plaintiffs have truly won!

Additionally, perhaps some solace is owing to plaintiffs' counsel. These lawyers, doubtless, have proceeded here with an attorney fee arrangement contingent upon the amount of recovery. This procedure is entirely acceptable and understood. They

have surely advanced substantial expenses necessary for the successful trial of this case. To reduce the recovery reduces their expectancy. Fortunately, trial of this case involves the kinds of lawyers with whom the Court can find comfort in open discussions.

The Court is first to note that it is only through these attorneys' considerable efforts, their commitment of much time in study and preparation, and their skills in the trial of this case, that plaintiffs have prevailed. Not every lawyer would share this experience. In the Court's view, however, they are also the kinds of lawyers who quietly share a certain professional satisfaction and sense of pride in seeing our adversary system work. Their efforts here have literally changed an industry! In the minds of good lawyers such as these, no amount of recompense quite touches that accomplishment. To them, the Court suggests that there will be other cases and other conquests. Indeed, attorneys such as these are always welcome here.

IT IS THEREFORE ORDERED this 24 day of May, 1985, that the jury's assessment of ten million dollars ($10,000,000.00) punitive damages is reduced to the sum of one million three hundred fifty thousand dollars ($1,350,000.00), effective from the date of first entry of judgment.