Aaron BRAVMAN and Muriel Bravman, Plaintiffs,

v.

BAXTER HEALTHCARE CORPORATION, Defendant.

No. 89 Civ. 3444 (RWS).

United States District Court, S.D. New York.

Jan. 24, 1994.

Cowan, Liebowitz & Latman, P.C., New York City (Joshua Paul and J. Christopher Jensen, of counsel), for plaintiffs.

Donovan, Leisure, Newton & Irvine, New York City (Daniel J. Thomasch, of counsel), Butler, Snow, O'Mara, Stevens & Cannada

Jackson, MS (Lee Davis Thames, of counsel), for defendant.

## OPINION

SWEET, District Judge.

Defendant Baxter Healthcare Corporation ("Baxter") has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure to dismiss the Complaint of Plaintiffs Aaron Bravman ("Bravman") and his wife Muriel. Defendant also moves in limine to preclude all evidence concerning a third party's suicide attempt and studies concerning the noise of the heart valve. For the reasons set forth below, Baxter's motion for summary judgment is granted. The motion in limine concerning the suicide is moot as Plaintiffs have conceded at oral argument of this motion that they will not introduce any evidence. The motion in limine concerning the studies was denied at oral argument except to the extent they refer to St. Jude and other values, and granted as to any reference to the Baxter valve.

### The Parties

Bravman and his wife are Pennsylvania residents. Bravman, a retired stock broker, is in his mid–60s.

Baxter is an Illinois corporation with its principal place of business in Deerfield, Illinois. Baxter's Edwards CVS Division manufactured the Edwards–Duromedics Bileaflet Heart Valve (the "Valve") which was surgically implanted in Bravman's heart.

### Prior Proceedings

The Bravmans filed this action on May 17, 1989. On June 7, 1989, they filed an Amended Complaint as a matter of right. In the Amended Complaint, Bravman had asserted four causes of action: breach of express warranty, breach of implied warranty, negligence, and strict products liability. Mrs. Bravman sought damages for loss of consortium.

On October 9, 1991, after close of discovery, Baxter filed a motion for summary judgment, requesting that Bravman's complaint be dismissed with prejudice. On May 18, 1992, this Court granted the Defendant's motion on the grounds that Bravman's fear that the Valve might fail was legally insufficient to support an injury claim and that the excessive noise emitted from the Valve failed to state a legally cognizable product defect claim under New York State law. *Bravman v. Baxter Healthcare Corp.*, 794 F.Supp. 96 (S.D.N.Y.1992) ("*Bravman I*"), aff'd in part and rev'd in part, remanded, 984 F.2d 71 (2d Cir.1993).

On appeal, the Second Circuit affirmed in part and reversed in part. *Bravman v. Baxter Healthcare Corp.*, 984 F.2d 71 (2d Cir. 1993). The Court affirmed the finding that Bravman does not have a viable claim for relief under either a product or design defect theory of liability. *Id.* at 75–76. The Second Circuit reversed on the question of noise, and whether Baxter owed a duty to warn Bravman's doctor of the Valve's noise level. *See Id.* at 72 (holding Bravman is "entitled to a jury determination whether the noise emitted by the heart valve caused a cognizable injury and whether Baxter violated a duty to warn Bravman's doctor of the potential noise.").

Thereafter, for the first time in this action, Baxter then raised the defense of federal preemption with respect to the duty to warn claim by the instant motion for summary judgment. The motion was argued and considered fully submitted on September 8, 1993.

### Facts

The facts in this diversity action are fully set forth in the prior opinions of this Court, familiarity with which is assumed. *See Bravman I*, 794 F.Supp. 96 (S.D.N.Y.1992).

To recapitulate briefly for the purposes of these motions, on April 5, 1988, Bravman underwent surgery at New York University Hospital to replace his natural mitral heart valve with the Valve. Without the surgery, it was estimated that Bravman would have lived no more than another five years.

The Valve implanted in Bravman has continuously functioned but according to Bravman it is excessively noisy. Although all artificial heart valves emit noise, Bravman contends that his is so loud that it can be heard at distances up to thirty feet.

Bravman has complained that the Valve's vibrations and clicks have caused him great distress, including: loss of sleep, depression, and lack of concentration. In addition, he has taken a premature retirement soon after his surgery. Although no evidence has been submitted that the operation of Bravman's heart is faulty, Bravman nevertheless contends he " 'lives unnecessarily with the fear that his Duromedics valve may fail mechanically. He is reminded of this fact during every waking moment because his heart valve is so loud.' " *Bravman I*, 794 F.Supp. at 98.

Baxter stopped manufacturing the Valve and withdrew it from the market shortly after Bravman's surgery. The company had received reports of "leaflet escape"[1] and withdrew the Valve at the suggestion of the Food and Drug Administration ("FDA").

Bravman has submitted evidence showing that Baxter knew that the Valve was noisier than other artificial heart valves before the date of Bravman's surgery. As early as 1985, Baxter's predecessor had received complaints about the noise. In August 1985, the company sent someone to investigate a Valve implanted in a patient in Arizona that could be heard from twenty feet away.

Baxter conducted a study comparing the noise generated by the Valve with the St. Jude Medical Valve. In a presentation to the American Heart Association in November 1986, an independent physician stated that one problem with the Valve was its excessive noise. Other doctors noted concerns over the Valve's noise at a Baxter-sponsored symposium in February 1987. Two doctors argued that the potential for noise should be discussed with patients before surgery.

In August 1986, after reviewing the Valve's design and manufacture, the FDA approved it for general sale in the United States. *See* 51 Fed.Reg. 34,254 (1986). As part of the premarket approval process ("PMA"), the FDA considered the Valve's product specifications, the results of animal and clinical studies of the Valve, the Valve's manufacturing methods and the Valve's proposed labeling. *See generally* 21 U.S.C. § 360c (description of PMA process). Baxter amended its PMA application and provided supplements on ten occasions to address FDA concerns. Baxter's PMA was approved by the Circulatory System Devices Panel, an FDA advisory committee. *See* 21 U.S.C. § 360c(b).

## I. *The Issue Presented*

For twenty-five centuries, Western knowledge has tried to look upon the world. It has failed to understand that the world is not for the beholding. It is for hearing. It is not legible, but audible. Our science has always desired to monitor, measure, abstract, and castrate meaning, forgetting that life is full of noise and that death alone is silent: work noise, noise of man, and noise of beast. Noise bought, sold or prohibited. Nothing essential happens in the absence of noise.[2]

In the context of a summary judgment motion, the issue presented is whether Bravman's duty to warn claim under state law is preempted by federal regulation.

### A. *The Standard For Summary Judgment*

The Rule 56 motion for summary judgment is "an integral part" of the Federal Rules of Civil Procedure and facilitates the overall purpose of the Rules as stated in Rule 1, namely, "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the

---

**1.** The Valve uses two movable disks, or leaflets, that open and close with each beat of the heart, thus controlling the flow of blood. Leaflet escape occurs when a leaflet structure fails, causing the leaflet to break away from the Valve and enter the blood stream. Of the roughly 18,364 Edwards–Duromedics Heart valves successfully implanted since 1982, leaflet escape had occurred in twenty mitral valves and five other valves by October 1991. Seventeen of these twenty-five patients survived. *Bravman I*, 794 F.Supp. at 98.

**2.** Jacques Attali, *Noise: The Political Economy of Music*, ch. 1 (1977).

moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Silver v. City Univ. of New York,* 947 F.2d 1021, 1022 (2d Cir.1991).

The Second Circuit has unambiguously defined the role of the district court in deciding Rule 56 motions:

> The district court's role ... requires the court not to resolve disputed issues of fact itself, but rather to see if there are issues of fact to be resolved by the factfinder at trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986). That is to say, when examining the record before it to see if there are any genuine issues of material fact, the court's focus is on issue-finding, not on issue-resolution. In making its assessment, the trial court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *See United States v. Diebold,* 369 U.S. 654, 655 [82 S.Ct. 993, 993, 8 L.Ed.2d 176] (1962) (per curiam).

*Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993).

The Second Circuit has repeatedly noted that "[a]s a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (citing *Celotex v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting) and *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)); *see United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962); *Cartier v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992); *Burtnieks v. City of New York,* 716 F.2d 982, 983–84 (2d Cir.1983). If, when "[v]iewing the evidence produced in the light most favorable to the nonmovant ... a rational trier [of fact] could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate."

*Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991).

When a motion for summary judgment is made and the nonmoving party will bear the burden of proof at trial, "Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim." *Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991). However, if the moving party is still entitled to judgment as a matter of law after all the facts alleged by the nonmoving party are resolved in his favor as true, then any remaining factual disputes are neither "genuine" nor "material" and will not prevent the court from granting the motion. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("a material fact is 'genuine' ... if the evidence is such that a reasonably jury could return a verdict for the non-moving party."). Thus, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Finally, the court must look to the substantive law to determine which facts are "material," to wit, disputed facts that might affect the outcome of the suit under governing law. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. It follows, then, that "[e]ntry of summary judgment indicates that no reasonable jury could return a verdict for the losing party." *Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2d Cir. 1991).

### B. *Principles of Federal Preemption*

The Supremacy Clause of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Since *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), the Supreme Court has held that state law which conflicts with federal law may be preempted.

In *Pennsylvania v. Nelson*, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956), Justice Warren enunciated a three-prong judicial inquiry as to whether federal law preempts a state law or regulation: first, a court must assess the comprehensive nature of the regulatory scheme; second, a court must determine if there is a dominant federal interest in the matter to be regulated and if there is a need for national uniformity; and third, a court must analyze the threat of conflict between state laws and the effective administration of the federal program. *Id.* at 502–06, 76 S.Ct. at 480–82; *See also Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985).

In analyzing the preemptive effect of federal regulations, the Supreme Court has held that: "The purpose of Congress is the ultimate touchstone." *Retail Clerks Int'l Ass'n v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963). Accordingly, supremacy analysis must begin "with the assumption that the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). However, "[c]ongress under the Commerce Clause may displace state power (*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 234–36 [67 S.Ct. 1146, 1154–55, 91 L.Ed. 1447]; *San Diego Council v. Garmon, supra,*) or it may even by silence indicate a purpose to let state regulation be imposed on the federal regime. *See Florida Avocado Growers v. Paul,* 373 U.S. 132, 141–43 [83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248]." *Retail Clerks Int'l Ass'n v. Schermerhorn,* 375 U.S. 96, 103–04, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963).

Several decades later, in *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) ("*Silkwood* "), the Court summarized the judicial test for ascertaining Congressional preemptive intent:

[S]tate law can be pre-empted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is preempted.

If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

*Id.* at 248, 104 S.Ct. at 621 (citations omitted). *See also Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597, —— – ——, 111 S.Ct. 2476, 2481–82, 115 L.Ed.2d 532 (1991) (holding valid state law is preempted when: (1) Congress expressly preempts state law; (2) Congress intends to completely occupy the given field; (3) compliance with both federal and state law is impossible; and (4) the state law is a barrier to achieving the full purposes and objectives of Congress).

In *Silkwood,* the Court held that although Congress clearly intended to prohibit the states from regulating the safety aspects of nuclear development, as the states are not competent to deal with technical safety considerations, there was insufficient evidence to find that Congress intended to forbid the States from providing punitive damage remedies. *Silkwood,* 464 U.S. at 250–51, 104 S.Ct. at 622–23 (finding "[statutory] silence takes on added significance in light of Congress' failure to provide any federal remedy for persons injured.... It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured...."). The Court held that Congressional silence as to the state court damages question, as well as the fact that Congress had not provided any federal remedies for an individual injured by Kerr–McKee's alleged conduct, sufficiently established Congressional intent not to preempt state court damages.

A federal agency exerting its regulatory mandate may preempt state regulation if that agency is "acting within the scope of its congressionally delegated authority." *Louisiana Pub. Service Comm'n v. FCC,* 476 U.S. 355, 369, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369 (1986) (holding preemption may result not only form congressional action, but also from federal agencies acting within the scope of

their congressionally delegated authority). However, this is not to say that an agency's power is unfettered:

> As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence.

*Hillsborough County v. Automated Medical Labs., Inc.,* 471 U.S. 707, 717, 105 S.Ct. 2371, 2377, 85 L.Ed.2d 714 (1985) (holding local ordinances concerning blood products are not preempted by the federal scheme). Further, "[i]t will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so. The exercise federal supremacy is not lightly to be presumed." *New York State Dep't of Social Services v. Dublino,* 413 U.S. 405, 413, 93 S.Ct. 2507, 2513, 37 L.Ed.2d 688 (1973) (quoting *Schwartz v. Texas,* 344 U.S. 199, 202–03, 73 S.Ct. 232, 235, 97 L.Ed. 231 (1952)).

In the area of toxic torts, for example, the Court remains reluctant to extend sweeping preemption powers to federal regulatory bodies. In *Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991), the Court held that local governments were permitted to regulate the use of pesticides and refused to find an "occupation of the field" preemption. *Id.* —— U.S. at ——, 111 S.Ct. at 2486. Similarly, the Court held in *International Paper Co. v. Ouellette,* 479 U.S. 481, 497–500, 107 S.Ct. 805, 814–16, 93 L.Ed.2d 883 (1987), that although the Clean Water Act preempts nuisance actions under state law against out-of-state sources, it does not preempt such actions against in-state polluters.

The Court's most recent pronouncement on tort preemption, *Cipollone v. Liggett Group, Inc.,* —— U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), held that in cases in which Congress has provided express pre-emption, the general presumption against preemption mandates the courts to read such provisions narrowly. *Id.* —— U.S. at ——, 112 S.Ct. at 2618. In *Cipollone,* the Court addressed the issue of whether federal labeling laws preempted state law tort claims. The Court first held that the 1965 preemption language "only pre-empted state and federal rulemaking bodies from mandating particular cautionary statements and did not pre-empt state law damages actions." *Id.* —— U.S. at ——, 112 S.Ct. at 2619. The Court reached its conclusion by first noting the traditional presumption against federal preemption by stating "[t]hat Congress requires a particular warning label does not automatically pre-empt a regulatory field," *id.* —— U.S. at ——, 112 S.Ct. at 2618, and then considering the "purpose" of Congress and the "regulatory context." *Id.* —— U.S. at ——, 112 S.Ct. at 2619.

Turning its attention to the 1969 Act, the Court found the preemption language in "[t]he phrase '[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law...." *Id.* —— U.S. at ——, 112 S.Ct. at 2620. In this vein, the Court held that claims arising out of cigarette advertising and promotion, but not claims arising out of testing and research were preempted.[3] *Id.* —— U.S. at ——, 112 S.Ct. at 2623–24. However, fraud claims in information disclosed to an administrative agency or out of fraudulent statements made in labeling, unrelated to the health warning, *id.* —— U.S. at ——, 112 S.Ct. at 2624, express warranty claims arising from the manufacturer's conduct, *id.* —— U.S. at ——, 112 S.Ct. at 2622, or state law claims arising from the manufacturer's purported conspiracy to deprive the

---

3. "Thus, insofar as claims under either failure to warn theory require a showing that respondents' post–1969 advertising or promotions should have included additional, or more clearly stated, warnings, those claims are pre-empted. The Act

does not, however, pre-empt petitioner's claims that rely solely on respondents' testing or research practices or other actions unrelated to advertising or promotion." *Cipollone,* —— U.S. at ——, 112 S.Ct. at 2621–22.

public of facts, *id.* —— U.S. at ——, 112 S.Ct. at 2624, were not preempted.

■ Accordingly, the party claiming preemption, as does Baxter here, has the burden of proof and must establish that Congress has spoken clearly and made its intention to preempt unmistakable. Alternately, Baxter must demonstrate that federal law preempts state law to the extent that the state law actually conflicts with or frustrates the purpose of federal law. Thus, if it is possible to comply with both federal and state law, there is neither a conflict nor a frustrated purpose. *See generally* Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure,* § 12 (2d ed. 1992 & Supp.1993).

With these general principles in mind the specific act in question must be considered.

## C. *The Preemptive Effect of the Medical Device Amendments Act of 1976*

The Second Circuit has not yet addressed the preemptive effect of the Medical Device Amendments Act of 1976 (the "MDA") upon tort actions in general, and on heart valve tort actions in specific. However, the Circuit's rulings generally find a strong presumption against federal preemption of state activities in traditional areas of state regulation. *See, e.g., Toy Mfrs. of Am., Inc. v. Blumenthal,* 986 F.2d 615 (2d Cir.1993); *Rogers v. Conrail,* 948 F.2d 858, 859 (2d Cir.1991); *Motor Vehicle Mfrs. Ass'n of the United States v. Abrams,* 899 F.2d 1315, 1317 (2d Cir.1990), *cert. denied,* 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991).

The Circuit ruled that preemption language similar to the preemption provision in the MDA did not prevent the Connecticut legislature from enacting a law requiring toys marketed for children between the ages of three and seven to bear a warning label that the toy contained small parts hazardous for children under three. Under the Federal Hazardous Substances Act's (FHSA) preemption provision, state regulations may not supplement the regulations adopted by the Consumer Product Safety Commission. The Act's preemption provision is broad, and states: "no State or political subdivision of a State may establish or continue in effect a requirement ... unless such requirement is identical to the requirement established under such regulations." *Toy Mfrs. of Am., Inc. v. Blumenthal,* 986 F.2d 615, 618 (2d Cir.1993) (quoting 15 U.S.C. § 1261 Note § 18(b)(1)(B) (1982)). Nevertheless, the Second Circuit declined to find that this preemptive language applied to legislation regarding small parts in toys since in order to find preemption "Congress (or the agency charged with administering a statute) must make its intent to preempt 'clear and manifest.'" *Id.* at 622 (finding neither express nor implied preemption).

Congressional intent, at the time of drafting the MDA, was driven by the growing public outcry against the completely unregulated—and often dangerous—nature of the medical devices market:

On January 28, 1975, the Health Subcommittee conducted a hearing which once again underlined the urgency of enacting medical device legislation. The hearing focused on the Dalkon shield, an IUD which was used by two million American women, and hundreds of thousands of women overseas, before the very significant health hazards of the device became known. All witnesses before the Committee, including the Commissioner of the Food and Drug Administration, testified that many of the deaths and much of the illness attributed to this device could have been prevented if medical device legislation, as provided in the reported bill, had been in effect when the Dalkon shield was developed.

Today the Food and Drug Administration only has limited authority to act with respect to a medical device in the market place which has been proven dangerous and patients have been injured. Medical device legislation is intended to assure that medical devices such as these IUD's meet the requirements of safety and effectiveness before they are put in widespread use throughout the United States.

. . . .

... The Committee wants to encourage ... research and development [of medical devices]. The Committee also wants to be

sure that the FDA has the proper authority to regulate that process so that Americans are not put at risk from the use of unsafe and ineffective medical devices.

S.Rep. No. 33, 94th Cong., 2d Sess. 3 (1976), *reprinted in* 1976 U.S.C.C.A.N. 1070, 1071.

The preemption language in the MDA is contained in the "State and local requirements respecting devices" provision, which states:

(a) General rule

Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

(b) Exempt requirements

Upon application of a State or a political subdivision thereof, the Secretary may, by regulation promulgated after notice and opportunity for an oral hearing, exempt from subsection (a) of this section, under such conditions as may be prescribed in such regulation, a requirement of such State or political subdivision applicable to a device intended for human use if—

(1) the requirement is more stringent than a requirement under this chapter would be applicable to the device if an exemption were not in effect under this subsection; or

(2) the requirement—

(A) is required by compelling local conditions, and

(B) compliance with the requirement would not cause the device to be in violation of any applicable requirement under this chapter.

21 U.S.C. § 360k.

■ The Supreme Court has stated that "Congress' intent may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.' " *Cipollone v. Liggett Group, Inc.,* — U.S. —, —, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)). Here, the structure of Section 360k(a) indicates that Congress intended to prohibit states—except in circumstances expressly provided for under Section 360k(b)—from asserting their regulatory powers over medical devices. Section 360k(b) allows a state to petition the FDA for permission to apply certain state regulations or requirements to medical devices. *See, e.g., Massachusetts v. Hayes,* 691 F.2d 57 (1st Cir.1982) (upholding FDA's denial of state regulatory exemption request).

The only section of legislative history discussing the logic behind the adoption of Section 360k's preemption language focuses on the need for nation-wide uniformity for medical device approval in light of the haphazard regulatory efforts of the states at the time.

The Committee recognizes that if a substantial number of differing requirements applicable to a medical device are imposed by jurisdictions other than the Federal government, interstate commerce would be unduly burdened. For this reason, the reported bill contains special provisions ... governing regulation of devices by States and localities. First, the reported bill prescribes a general rule that no State or political subdivision thereof may establish or continue in effect any requirement with respect to a device for human use which is different from, or in addition to, any requirement made applicable to such a device under the proposed legislation or existing provisions of the Federal Food, Drug, and Cosmetic Act.

In absence of effective Federal regulation of medical devices some States have established their own programs. The most comprehensive State regulation of which the Committee is aware is that of California, which in 1970 adopted the Sherman Food, Drug, and Cosmetic Law. This law requires premarket approval of all new medical devices, requires compliance of device manufacturers with good manufacturing practices and authorizes inspection of establishments which manufacture devices. Implementation of the Sherman Law has

resulted in the requirement that intrauterine devices are subject to premarket clearance in California.

Because there are some situations in which regulation of devices by States and localities would constitute a useful supplement to Federal regulation, the reported bill authorizes a State or political subdivision thereof to petition the Secretary for exemptions from the bill's general prohibition on non-Federal regulation....

In the Committee's view, requirements imposed under the California statue serve as an example of requirements that the Secretary should authorize to be continued ...

House Rep. No. 853, 94th Cong., 2d Sess. at 45–46 (1976).

The House Report indicates that the Congressional purpose behind Section 360k was merely to limit state regulatory bodies from establishing administrative mechanisms—like the cited Sherman Act of California—in absence of federal approval. Nowhere in the report, or in any of the legislative history, does Congress state an intent to limit state tort actions.[4]

Notwithstanding what may have been the original intent of Congress, the Agency Regulations parenthetically include court decisions in its definition of state requirements. *See* 21 C.F.R. § 808.1(b).[5] In addition, the Supreme Court has determined that state law requirements encompass common law tort actions.[6]

### D. *The Agency's Interpretation of § 360k: 21 C.F.R. § 808.1(d)*

Under *Chevron United State, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), courts must first look to an agency's regulations for guidance concerning the agency's interpretation of its Congressional mandate. *See also Schwartz v. Gordon*, 761 F.2d 864, 868 (2d Cir.1985). The FDA, the agency charged with implementing the MDA, has interpreted the language of 21 U.S.C. § 360k(a) in its regulations:

State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements.

21 C.F.R. § 808.1(d).

Later in the same section, the regulations provide that a state requirement will be preempted only if it contradicts a section of the Act itself or in the event the FDA has established a specific counterpart requirement with respect to the device.

(emphasis added).

---

4. *See* 121 Cong.Rec. 10,687–710 (1975); S.Rep. No. 33, 94th Cong., 2d Sess. 3, *reprinted in* 1976 U.S.C.C.A.N. 1070–103; House Conf.Rep. No. 1090, 94th Cong. 2d Sess. 3, *reprinted in* 1976 U.S.C.C.A.N. 1103–18; House Rep. No. 853, 94th Cong., 2d Sess. (1976).

5. 21 C.F.R. § 808.1(b) states:
   Section 521(a) [codified at 21 U.S.C. § 360k] of the act contains special provisions governing the regulation of devices by States and localities. That section prescribes a general rule that after May 29, 1976, no State or political subdivision of a State may establish or continue in effect any requirement with respect to a medical device intended for human use having the force and effect of law (whether established by statute, ordinance, regulation, or *court decision* ), which is different from or in addition to, any requirement applicable to such device under any provision of the act and which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under the act.

6. In *Cipollone v. Liggett Group, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2608, 2620, 120 L.Ed.2d 407 (1992), the Court stated:
   The phrase '[n]o requirement or prohibition' sweeps broadly and suggest no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common law rules. As we noted in another context, '[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959).
   Under this principle, the Court found "Congress was neither preempting nor saving common law as a whole—it was simply preempting particular common law claims, while saving others." *Id.* —— U.S. at ——, 112 S.Ct. at 2621, fn. 22.

Generally, section 521(a) does not preempt a State or local requirement prohibiting the manufacture of adulterated or misbranded devices. Where, however, such a prohibition has the effect of establishing a substantive requirement for a specific device, e.g., a specific labeling requirement, then the prohibition will be preempted if the requirement is different from, or in addition to, a Federal requirement established under the act.

21 C.F.R. § 808.1(d)(6)(ii). According to the regulations, then, if the MDA or the FDA has not established specific counterpart requirements or other specific requirements applicable to a particular device, the states are certainly not precluded from establishing limited requirements.

In *Slater v. Optical Radiation Corp.*, 961 F.2d 1330, 1331 (7th Cir.) ("*Slater*"), *cert. denied*, —— U.S. ——, 113 S.Ct. 327, 121 L.Ed.2d 246 (1992), in which the plaintiff asserted a design defect claim, the Honorable Richard Posner cited 21 C.F.R. § 808.1(d) as saying that the FDA "has declared that preemption ... is limited to cases in which the FDA 'has established specific counterpart regulations [to the challenged state requirements] or there are other specific requirements applicable to a particular device under' the federal act. 21 C.F.R. § 808.1(b), (d)." Judge Posner continued to find that in the year following the enactment of the MDA, the FDA issued "Investigational Device Exemption Regulations" specifically for intraocular lenses, *see* 21 C.F.R. pt. 813, the device at issue in *Slater*.

Indeed, the FDA's regulations for intraocular devices are extremely specific: For example, §§ 813.1–.19 describes the general qualifications for exemption; §§ 813.20–39 describes the application for exemption for investigation studies involving human subjects; §§ 813.40–50 describes the sponsor's responsibilities in investigational studies of intraocular lenses; §§ 813.60–79 describes the institutional review committee requirements; §§ 813.100–.119 describes the investigator's responsibilities in investigational studies of intraocular lenses; §§ 813.150–155 describes the required inspections, reports and records; and §§ 813.160–170 describes the requirements for investigational studies that do not involve human subjects. 21 C.F.R. § 813 *et seq.*

Judge Posner ultimately denied the Slater's claim on the basis that a design defect challenge based on state products liability law against an experimental device regulated by the FDA was contrary to the specific counterpart regulations governing intraocular devices.[7] In doing so, Judge Posner distinguished the preemption provision in the MDA from the "sort of blanket preemption that we find in ERISA, which supersedes 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.' " *Id.* at 1334 (quoting 29 U.S.C. § 1144(a); citing the Supreme Court in *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)).[8]

The Fifth Circuit has also read § 808.1(d) to find that "according to the FDA 'the scope of preemption is limited to instances where there are specific FDA requirements applicable to a particular device or class of devices.... The phrase 'or addition to, any requirement applicable under this Act to the device' means that an FDA requirement must exist before preemption can occur.' " *Moore v. Kimberly–Clark Corp.*, 867 F.2d 243, 245 (5th Cir.), *reh'g denied*, 873 F.2d 297 (1989) (quoting *Rinehart v. International*

---

**7.** "[Plaintiff's] argument assumes that the only federal requirement that might relate to the safety or effectiveness of the design of a medical device would be an actual specification of that design. The preemption provision does not say this, and so cramped an interpretation would cripple the exemption for investigational devices. The FDA can hardly be expected to specify the safe and effective design of a device when it is still experimental. If there were a known safe and effective design, the device would no longer be experimental. The point of the experiment is to find out whether it is safe and effective. In the experimental phase the appropriate regulations of safety and effectiveness are procedural rather than substantive ones. They do not specify the safe and effective design; they specify the procedures for determining whether the experimental design is safe and effective. These are requirements relating to safety and effectiveness and they can therefore have preemptive effect." *Slater*, 961 F.2d at 1333 (citation omitted).

**8.** Judge Posner also noted that Plaintiffs are not left remediless in that they may utilize the tort law of medical battery, *Slater*, 961 F.2d at 1334.

*Playtex, Inc.* 688 F.Supp. 475 (S.D.Ind.1988) (quoting 43 Fed.Reg. 18,622 (1978)).

■ The only regulatory mention of heart valves occurs at 21 C.F.R. § 870.3925, a section that merely identifies replacement heart valves as a medical device and cannot be construed as a counterpart requirement. An "identification provision" in the federal regulations does not act as a specific requirement which would preempt state common law. This is especially true in light of Cardiovascular Device section's self-limiting scope: "[t]he identification of a device in a regulation in this part is not a precise description of every device that is, or will be, subject to regulation." *See* 21 C.F.R. § 870.1(a), (b); *See also Elbert v. Howmedica,* 841 F.Supp. 327, 330 (D.Haw.1993) (pointing out similar identification provisions for orthopedic devices at 21 C.F.R. § 888.1(a) and (b) do not prescribe or establish standards for design, composition, or construction; "the identifica-

tion parameters of the knee joint device in § 88.3560 are not 'requirements' that would trigger federal preemption under §§ 360k and 808.1(d).").

The issue here, then, revolves around the interpretation of the FDA's regulations: specifically in 21 C.F.R. § 808.1(d), whether the absence of specific federal counterpart regulations prescribing the design and labeling of heart valves preempts state tort claims, or alternately, whether the fact that a device has received Class III premarket approval classification under the MDA constitutes a specific requirement applicable to a particular device within the meaning of 360k and 21 C.F.R. 801.1(d).

The Courts have been troubled by similar questions in multiple contexts ranging across the fields of: eye implants [9], cosmetic treatments, hearing aides [10], pacemakers [11], breast implants [12], tampons, IUDs [13], pesticide control [14], and vaccines [15]. In an effort to dis-

9. *See, e.g., Slater v. Optical Radiation Corp.,* 961 F.2d 1330, 1331 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 327, 121 L.Ed.2d 246 (1992); *Mitchell v. Iolab Corp.,* 700 F.Supp. 877, 878–79 (E.D.La.1988) (no federal preemption of state tort law); *Covey v. Surgidev Corp.,* 815 F.Supp. 1089, 1094–95 (N.D.Ohio 1993) (federal preemption under specific counterpart regulations governing experimental devices.).

10. *See, e.g., Smith v. Pingree,* 651 F.2d 1021, 1024 (5th Cir. Unit B 1981) (state regulations involving the fitting, sale and packaging of hearing aids are not preempted by 21 U.S.C. § 360k); *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 N.J. 544, 572, 384 A.2d 795 (1978) (holding federal preemption of state requirement applicable only if conflicts with specific federal counterpart regulations).

11. *See, e.g., Larsen v. Pacesetter Sys., Inc.,* 74 Haw. 1, 837 P.2d 1273, 1281–82 (1992) (holding plaintiff's design defect state tort claim not preempted by Act merely because defendant manufacturer obtained premarket approval for pacemaker).

12. *See, e.g., Desmarais v. Dow Corning Corp.,* 712 F.Supp. 13, 15 (D.Conn.1989) (holding failure to warn of breast implant leakage not actionable under state common law because implants complied with MDA).

13. *See, e.g., Callan v. G.D. Searle & Co.,* 709 F.Supp. 662, 668 (D.Md.1989) (no federal preemption of state claims as compliance with both is possible); *Allen v. G.D. Searle & Co.,* 708 F.Supp. 1142, 1150 (D.Or.1989) (since IUD is

drug and device, MDA does not preempt state product liabilities suit against manufacturer); *Kociemba v. G.D. Searle & Co.,* 680 F.Supp. 1293, 1298 (D.Minn.1988) (since FDA considers IUD to be prescriptive drug, section 360k does not apply, if it did "requirement" does not include tort law); *Tetuan v. A.H. Robins, Co.,* 241 Kan. 441, 738 P.2d 1210, 1232–33 (1987) (MDA only preempts claims under counterpart regulations, not to false labeling claims).

14. *See, e.g., Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597, 111 S.Ct. 2476, 2481–82, 115 L.Ed.2d 532 (1991) (FIFRA does not preempt local authority's right to institute local regulations); *Ferebee v. Chevron Chem. Co.,* 736 F.2d 1529, 1539–43 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984) (rejecting defendant Paraquat pesticide manufacturer's argument that imposition of tort liability under state common law was tantamount to amending EPA-approved label in a failure to warn action); *Papas v. Upjohn Co.,* 926 F.2d 1019 (11th Cir.1991) (FIFRA preemption language regarding labeling preempts failure to warn claims), *vacated and remanded,* —— U.S. ——, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992), *aff'd on reconsideration,* 985 F.2d 516 (1993); *New York State Pesticide Coalition, Inc. v. Jorling,* 874 F.2d 115, 118–20 (2d Cir.1989) (state regulations requiring notice of pesticide ingredients and dangers to potentially affected persons falls within FIFRA savings clause and are not preempted); *Burke v. Dow Chem. Co.,* 797 F.Supp. 1128 (E.D.N.Y.1992) (FIFRA does not preempt any of the state tort claims).

15. *See, e.g., Abbot v. American Cyanamid Co.,* 844 F.2d 1108, 1111–13 (4th Cir.) (reversing district

cern meaning from chaos, a review of two sample areas from the field of case law seems appropriate.

### 1. *Counterpart Regulations: The Tampon Cases*

Usually in the tampon cases, women plaintiffs, having recovered from a bout of Toxic Shock Syndrome ("TSS"), file state tort actions against tampon manufacturers based on various theories of liability including: duty to warn, design defect, and manufacturing defects. The Federal regulations for tampons consist of three parts, two of which simply identify and classify scented and unscented tampons as Class II gynecological devices. *See* 21 C.F.R. § 884.5460 (scented) and § 884.5470 (unscented).

The third section of the regulations, contains explicit labeling counterpart regulations which prescribe the warning labels that tampon manufacturers must include on, as well as inside, all tampon packaging.[16] The warning provisions described in 21 C.F.R. § 801.-430 are designed "[t]o protect the public and minimize the adverse effects of Toxic Shock Syndrome...." 21 C.F.R. § 801.430(b). This section provides for an explicit warning label and how such consumer communication shall be rendered, § 801.430(d), (e), specifically: the warning signs of TSS, § 801.-430(d)(1)(i); what to do if such signs appear, § 801.430(d)(1)(ii); risk grouping of women affected by age, § 801.430(d)(2); the advisability of using tampons during light menstrual cycles, § 801.4430(d)(3); other options

besides tampons, 801.430(d)(4); the appropriateness of seeking medical advice if TSS warning signs have occurred, § 801.430(d)(5); the absorbency terms to be displayed on the packages and explanation of such terms § 801.430(e)(1), (2); and the absorbency tests that a manufacture shall use, § 801.430(f); and an exemption for tampons in vending machines, § 801.430(g).

In light of these explicit labeling provisions, the courts have found federal preemption of state claims based on a duty to warn theory, but have preserved other state tort law claims. *Moore v. Kimberly–Clark Corp.*, 867 F.2d 243, 246, *reh'g denied*, 873 F.2d 297 (5th Cir.1989) (holding identification section in FDA regulations does not preempt state law claims of negligent design and breach of warranty; federal requirements regarding tampon labeling and warning statements do not preempt plaintiff's state law claims based on the design, composition and construction of tampons.); *see also, Bejarano v. International Playtex, Inc.*, 750 F.Supp. 443, 445–46 (D.Idaho 1990) (holding counterpart labeling regulations preempt state duty to warn claims; failure to properly design and construct tampons claims not preempted by federal law); *Krause v. Kimberly–Clark Corp.*, 749 F.Supp. 164, 168–69 (W.D.Mich.1990) (holding state law tort claims of labeling preempted by federal counterpart regulations, but negligence and breach of implied warranty state tort law claims not preempted); *Rinehart v. International Playtex, Inc.*, 688 F.Supp. 475, 477–78 (S.D.Ind.1988) (holding state regulations concerning labeling and

court's summary judgment determination for DPT vaccine manufacturer; no federal preemption due to FDA's regulatory occupation of the field; state court claims do not frustrate the national public health policies supporting immunizations as Congress presumed state tort and contract remedies would be available to plaintiffs) *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); *Graham v. Wyeth Labs.*, 906 F.2d 1399, 1405 n. 9 (10th Cir.1990) (agreeing with district court's preemption analysis refusing to find DPT vaccine manufacture, who had followed FDA standards, but whose product nevertheless caused serious injury to a child, immune from state tort claims); *Wack v. Lederle Labs.*, 666 F.Supp. 123, 126–28 (N.D.Ohio 1987) (rejecting defendant's implied preemption claims based on FDA's occupation of the field to permit parents' state common law tort action against

DPT vaccine manufacturer on the grounds that such preemption would effectively immunize all drug manufacturers from liability.); *MacGillivray v. Lederle Labs.*, 667 F.Supp. 743, 744–46 (D.N.M.1987) (state may accept FDA's determination of drug's marketability, but the manufacture must nevertheless bear the cost of possible injuries); *Morris v. Parke, Davis & Co.*, 667 F.Supp. 1332, 1338–39 (C.D.Cal.1987) (holding no preemption based on *Hillsborough* analysis and legislative history of National Childhood Vaccine Injury Act of 1986).

**16.** The uniform warning label reads: "Attention: Tampons are associated with Toxic Shock Syndrome (TSS). TSS is a rare but serious disease that may cause death. Read and save the enclosed information." 21 C.F.R. § 801.430(c).

warning preempted by FDA which expressly set forth labeling and warning standards § 801.430; packaging and design defect claim state tort claim not preempted); *O'Gilvie v. International Playtex, Inc.*, 609 F.Supp. 817 (D.Kan.1985), *aff'd in part and rev'd in part*, 821 F.2d 1438 (10th Cir.1987), *cert. denied*, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988) (no preemption). *But see Lavetter v. International Playtex*, 706 F.Supp. 722, 723 (D.Ariz.1988) (holding federal warning requirement 21 C.F.R. § 801.430 preempts state claims).[17]

Accordingly, in the Tampon Cases, the courts have tended to find that the FDA's labeling requirements constituted "counterpart" regulations which preempt state law duty to warn claims, but not design defect claims, or manufacturing claims.

### 2. *The Zyderm Cases*

In reaching a different conclusion, the First and Fifth Circuits have held that the MDA preempts state tort actions revolving around a Class III device—a cosmetic substance called Zyderm. *See King v. Collagen Corp.*, 983 F.2d 1130 (1st Cir.) ("*King* "), *cert. denied*, —— U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993); *Stamps v. Collagen Corp.*, 984 F.2d 1416 (5th Cir.) ("*Stamps* "), *cert. denied*, 114 S.Ct. 86 (1993). In both these cases, the plaintiffs had contracted an auto-

immune disease as a result of using the manufacturer defendant's product, a cosmetic medical device used to correct wrinkles.

In *King*, the plaintiff filed suit against the manufacturer on theories of strict liability, breach of warranty, negligence, misrepresentation, failure to warn, and fraud. *See King*, 983 F.2d 1130 (1st Cir.1993). The First Circuit held that under the regulatory scheme for Class III medical devices, the FDA must evaluate the devices with an eye for "ensuring a reasonable level of safety for its users." *Id.* at 1135. The *King* Court held that the FDA's evaluation and approval of Zyderm as a Class III medical device preempted the plaintiff's claims in strict liability; negligence; product misbranding, misrepresentation and failure to warn; and in fraud. *Id.* at 1135–36. *See also Stamps*, 984 F.2d at 1422 (holding that MDA regulatory structure for a Class III device preempts inadequate labeling, defective design and manufacture claims);[18] *Reiter v. Zimmer, Inc.*, 830 F.Supp. 199 (S.D.N.Y.1993) (following the holdings of *King* and *Stamps* to find federal preemption of state tort claims concerning premature hardening of bone cement).

However, the *King* Court also noted that in approving Zyderm, the FDA had promulgated and revised a specific warning requirement directly related to the potential risk of autoimmune disease:

> When Ms. King received Zyderm [in 1987], Zyderm's FDA-approved labeling contrain-

---

**17.** Additional district courts which have granted summary judgment dismissing state claims based on inadequate warnings, include: *Meyer v. International Playtex, Inc.*, 724 F.Supp. 288, 293 (D.N.J.1988); *Lindquist v. Tambrands, Inc.*, 721 F.Supp. 1058, 1061–63 (D.Minn.1989); *Briggs v. International Playtex, Inc.*, No. 86–C–540–B, 1988 U.S.Dist. LEXIS 15573, at *3 (N.D.Okla. April 7, 1988); *Stewart v. International Playtex, Inc.*, 672 F.Supp. 907, 909–10 (D.S.C.1987); *Edmondson v. International Playtex, Inc.*, 678 F.Supp. 1571 (N.D.Ga.1987); *Ignace v. International Playtex, Inc.*, No. 84–1562, 1987 WL 93996, 1987 U.S.Dist. 13609 (N.D.Wis. Aug. 14, 1987). *Northrip v. International Playtex, Inc.*, 750 F.Supp. 402, 405 (W.D.Mo.1990); *Needham v. International Playtex Inc.*, Cv. No. 87–152, 1989 WL 8812, *1, 1989 U.S.Dist. LEXIS 800, at *2 (E.D.Ky. Jan. 26, 1989). *See also Berger v.*

*Personal Prods., Inc.*, 115 Wash.2d 267, 797 P.2d 1148, 1151–52 (1990), *cert. denied*, 499 U.S. 961, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991).

**18.** The *Stamps* Court also re-construed the Fifth Circuit's own precedent in *Moore*, which limited federal preemption to tampon labeling claims (in light of the specific labeling regulations) but preserved other state tort claims, to stand for the proposition that Class III, but not Class II, medical devices preempt state tort claims. In addition, the *Stamps* court ignored the fact that the device in *Slater* was a Class III medical device and that Judge Posner only found preemption in light of the specific investigational requirements of the regulations preempted state tort claims concerning design and manufacture of experimental devices. *See Stamps*, 984 F.2d at 1423 n. 7.

dicated use by those with a personal history of autoimmune disease. Since that time, however, the FDA has gradually allowed Collagen to change the labeling as it related to autoimmune disease. By 1991, Zyderm was no longer contraindicated for persons with a history of autoimmune disease. The FDA required a warning in 1991, however, that some recipients have suffered from unwanted autoimmune reactions, but that no causal connection between Zyderm and these reactions has been shown.

*King,* 983 F.2d at 1132. However, the *King* court did not interpret the fact that the FDA previously had issued specific warning requirements addressing the plaintiffs' preexisting conditions as an additional requirement preempting state law. Instead the *King* court found that the fact that a manufacturer had to undergo the premarket approval process was a specific requirement within the meaning of the preemption language of 360k and 801.1(d).[19]

In *Slater,* to comply with the federal regulations and to allow state tort claims was not possible since the specific counterpart regulations for experimental lens precluded compliance with the plaintiff's state law design and manufacturing claims. In *King* and *Stamps,* the First and Fifth Circuits have held that the onerous premarket approval process necessary to receive Class III approval constitute an additional requirement under the language of 360k and 21 C.F.R. 801.1(d).

## II. Class III Classification Preempts State Law Claims Under the MDA and Mandates Summary Judgment

■ Baxter relies upon on *King* and *Stamps* to read into the MDA a federal preemptive bar against Bravman's duty to warn claim contending that once a device has wended its way through the FDA's PMA process a manufacturer is immunized from state law causes of action. Although the FDA has not issued any specific counterpart regulations for heart valves, it appears that state law tort claims based upon a failure to warn about noise would in effect constitute an additional labeling requirement beyond the Class III approval process.

Compelling reasons have been articulated to oppose federal preemption. First, the state law tort system currently acts as an incentive for manufacturers to continue to improve their products as well as to disclose developments in product safety and their side effects. *See* Calabresi & Klevarick, *Four Tests for Liability in Torts,* 14 J.Legal Stud. 585, 621–25 (1985).

Second, to allow blanket federal preemption by Class III designation may encourage manufacturers to withhold disclosure of potential problems with their devices to the FDA. Agency failure, and the FDA's reliance on the manufacturers themselves for the plethora of information regarding product labeling is a source of concern. *See, e.g.* Merrill, *Compensation for Prescription Drug Injuries,* 59 Va.L.Rev. 1, 4–5 (1973).[20] Presumably, however, there are criminal penal-

---

**19.** Both *King* and *Stamps* attempt to construe the respective holdings of Judge Posner in *Slater* and Justice Stevens in *Cipollone* for the proposition that federal regulations effectively preempt state tort claims. However, in *Cipollone,* discussed *supra,* Justice Stevens held that a specific federal labeling requirement preempted state tort claims concerning labeling but declined to extend such an analysis state tort claims concerning design defect. Similarly, Judge Posner held that the specific experimental counterpart regulations concerning experimental intraocular lenses were the source of federal preemption for the plaintiffs tort law claims, *Slater,* 961 F.2d at 1332–33, not the fact that they were Class III medical devices.

**20.** In addition, it is not beyond the realm of possibility that some manufacturers may simply

not disclose or may misdisclose critical product information. *Id.* at 22–23 (discussing the failure of Richardson–Merrell to report test results revealing the adverse effects of MER/29). Previously, courts have noted that determining whether the labeling of a product is consistent with the federal regulatory scheme and determining if the manufacturer withheld, "either at the time the FDA decided the content of the warning, or since then, information that would have changed the FDA's decision" are jury questions. *See Hurley v. Lederle Lab. Div. of Am. Cyanamid Co.,* 863 F.2d 1173, 1179–80 (5th Cir.1988) (finding such questions precluded summary judgment for manufacturer in parent's failure to warn action on behalf of infant who suffered adverse reaction to DPT vaccine).

ties against misleading a federal regulatory agency which would deter such unscrupulous practices.

Third, it is relevant to note that a grant of summary judgment in these circumstances would leave allegedly injured plaintiffs without any remedy.[21] As the Honorable Jack Weinstein has commented: "Too ready a tendency to declare the state protective shield replaced by the still somewhat spotty federal protections will leave many injured persons without recourse." *Burke v. Dow Chem. Co.*, 797 F.Supp. 1128, 1132 (E.D.N.Y.1992); *see also* Gregory C. Jackson, *Pharmaceutical Product Liability May Be Hazardous to Your Health: A No–Fault Alternative to Concurrent Regulation,* 42 Am.U.L.Rev. 199, 222 n. 149 (1992) (in describing federal preemption of state tort claims the "courts have not addressed the fact that plaintiffs have consequently been denied a remedy.").[22] It must be recognized that state tort actions, although clearly imperfect, remain a powerful incentive for improving product safety. *See Graham v. Wyeth Labs.*, 666 F.Supp. 1483, 1493 (D.Kan.1987); *MacGillivray*, 667 F.Supp. at 745.

Here, as noted above, there are no specific warning or labeling requirements for heart valves in the regulations, in fact the only regulation discussing heart valves—21 C.F.R. § 870.3925—simply describes heart valves and categorizes them as Class III medical devices.[23] In addition, there is no evidence in this record as to whether or not the FDA

considered the noise question, or even had information concerning noise, when it reviewed the Valve. Finally, the ramification that the FDA's classification of a device can preempt state law tort claims, as held in *King* and *Stamps* remains a significant concern.

Notwithstanding, a careful reading of the FDA's regulations results in the conclusion that state tort remedies—such as Bravman's duty to warn claim—would be preempted when the FDA chose to approve the Valve as a Class III device and its proposed labeling. Despite some reservation, the holding of *King* will prevail and accordingly, Baxter's motion for summary judgment is granted.

### Conclusion

For the reasons set forth above, Baxter's motion for summary judgment is granted. The motion in limine concerning the suicide is moot as Plaintiffs have conceded at oral argument of this motion that they will not introduce any evidence. The motion in limine concerning the studies was denied at oral argument except to the extent they refer to St. Jude and other valves, and granted as to any reference to the Baxter Valve.

It is so ordered.

---

**21.** A veritable cottage industry of student notes has responded to the reservations, expressed both by the judiciary and regulators, concerning the regulatory preemption of state tort law remedies. *See e.g.* Note: *Pharmaceutical Regulation,* 103 Harv.L.Rev. 773 (1990) (arguing for federal preemption in the pharmaceutical context); Note: Marilyn P. Weserfield, *Comment: Federal Preemption and the FDA: What Does Congress Want?* 58 U.Cin.L.Rev. 263 (1989) (arguing against blanket preemption in the drug products field as public health and safety are considered within the power of states and state courts to protect); Note: Mary Lee A. Howarth, *Preemption and Punitive Damages: The Conflict Continues Under FIFRA,* 136 U.Pa.L.Rev. 1301, 1344 (arguing that judges should find federal preemption in FIFRA cases as the EPA has "occupied the field".).

**22.** In this regard, the former Chief Counsel of the FDA has argued that: "[the] FDA has no exper-

tise or authority for managing systems of redress for private injuries. The value judgment necessary for such management—how the scales for plaintiffs and defendants should be set up—are best left to legislatures and courts." Richard M. Cooper, *Drug Labeling and Products Liability: The Role of the Food and Drug Administration,* 41 Food Drug Cosm.L.J. 233, 233 (1986).

**23.** It is difficult to assess the implication of this lack of labeling requirements, as it is recognized that when the FDA is informed of the potential side effects, such as toxic shock syndrome, the agency can, and often does, promulgate uniform labeling requirements which effectively protect the manufacturers and consumers alike. *See, e.g.,* 21 C.F.R. § 801.430 and discussion of Tampons cases, *supra.* Labels are, of course, included in the Class III premarket approval process.