Karen L. CAMERON and John
Cameron, Plaintiffs,

v.

HOWMEDICA, DIVISION OF PFIZER
HOSPITAL PRODUCTS GROUP, INC.,
jointly and severally, Defendants.

Civ. A. No. 92–CV–40235–FL.

United States District Court,
E.D. Michigan,
S.D. Flint.

Feb. 17, 1993.

Joseph R. Lobb, Southfield, MI, for plaintiffs.

James S. Goulding, Detroit, MI, for defendants.

### MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

Pending before the Court is Defendant's Motion for Summary Judgment on the grounds that the Medical Device Amendments of 1976 ("MDA") to the Federal Food Drug and Cosmetic Act ("FDCA"), codified at 21 U.S.C. § 360k preempts Plaintiff's product liability defective design claim under state law.

### FACTS

Plaintiff, Karen L. Cameron, obtained a total right hip replacement through surgery

performed on February 3, 1987 with a prosthesis made by Howmedica, Division of Pfizer Hospital Products Group, Inc. ("Howmedica"). This prosthesis had three main parts: a femoral shaft and ball heading, which fits into the femur; a cup which is fitted into the hip bone; and a plastic insert which allows the femoral head to move within the hip cup. The cup was made of non-porous titanium. Complaint at 3; Plaintiff's supplemental brief at 2.

Shortly after recovery, Plaintiff began to experience great pain, which eventually led to replacement surgery in 1989 with a new artificial hip made with a porous cup. Plaintiff sued Howmedica in the Michigan state court under several state tort theories. Howmedica removed the case to federal court asserting diversity jurisdiction. At a status conference, the Court ruled that only the design defect count remained. Scheduling Order of October 23, 1992.

Defendant then brought this motion.

## ANALYSIS

Article VI of the Constitution dictates that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

State laws that conflict with federal laws and regulations, therefore, are preempted. *E.g., Malone v. White Motor Corp.*, 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978). In determining whether such a conflict exists, it is well settled that the intent of Congress governs. *Id.* at 504, 98 S.Ct. at 1189.

Congress may express its intent to preempt state law explicitly in the language of the statute. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Congress may express its intent implicitly by passing an extensive statutory scheme that extensively covers the field of regulation. *Fidelity Fed. Sav. & Loan Ass'n. v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). Implied preemption also occurs when a conflict between state and federal law makes compliance with both impossible, or when state law would frustrate the purpose and objectives of the federal law. *Id.*

The Supreme Court recently revisited this difficult area in *Cipollone v. Liggett Group, Inc.*, —— U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). In *Cipollone*, a victim of lung cancer sued several cigarette manufacturers for breach of warranties contained in cigarette advertisements, for failure to warn of health hazards related to smoking, for fraudulently misrepresenting those hazards to the public, and for conspiracy to deprive the public of important health information. *Id.*, at ——, 112 S.Ct. at 2613. The cigarette manufacturers contended that petitioner's claims were preempted by the federal law requiring a health warning to appear on all cigarette advertisements and containers. *Id.*, at ——, 112 S.Ct. at 2614.[1] The Court relied only on the specific language of the provision regarding preemption, stating that, "Congress' enactment of a provision defining the preemptive reach of a statute implies that matters beyond that reach are not preempted." *Id.*, at ——, 112 S.Ct. at 2618. The opinion analyzed each of petitioner's claims in light of the statute.

The First, Fifth, and Seventh Circuit Courts of Appeals have each analyzed the preemption provision of the MDA. *King v. Collagen Corp.*, 983 F.2d 1130 (1st Cir.1993); *Slater v. Optical Radiation Corp.*, 961 F.2d 1330 (7th Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 327, 121 L.Ed.2d 246 (1992); *Moore v. Kimberly–Clark Corp.*, 867 F.2d 243 (5th Cir.1989). *King v. Collagen Corp.* was written following the *Cipollone* case.

The First Circuit began its analysis by noting:

The express preemption provision in the MDA, 21 U.S.C. § 360k, forecloses inquiry

---

1. That law stated that "[n]o requirement or prohibition based on smoking or health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." Federal Cigarette Labeling and Advertising Act of 1965, § 5, as amended by Public Health Cigarette Smoking Act of 1969, § 2, 15 U.S.C. § 1334.

into implied preemption, because the fact that Congress included it in the MDA implies that matters beyond its reach are not preempted. Further, we note that the *Cipollone* plurality carefully construed the preemption provision to extend no further than its language warranted. In doing so, the plurality sought to pay proper respect to federal state relations. This concern arises out of "the assumption that the historic police powers of the states [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress."

*King* at 1133, *quoting Cipollone,* — U.S. at ——, 112 S.Ct. at 2617. This Court will carefully construe the preemption provision of the MDA to give due regard to questions of federal-state relations.

The MDA states that

(a) Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k.

Under subsection (a), the Court must determine whether appellant's products liability claims give rise to state law requirements in addition to or different from those mandated by the Food and Drug Administration. Under *Chevron U.S.A., Inc. v. Natural Re-sources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the court will look to the FDA regulations for guidance. FDA regulations provide that preemption does not apply when the FDA has issued no regulations or other requirements specific to the particular device. 21 C.F.R. § 808.1(d).[2]

The F.D.A. has reasonably interpreted § 360(k) as extending to court decisions, and neither of the parties has argued otherwise, even when specifically provided an opportunity to do so by this court.[3] *See San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959) ("[State] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.").

In each of the three circuit cases, the court analyzed the regulation specific to the medical device to determine whether the state law claim was preempted. The First Circuit found, "In this case, it is clear that the FDA has imposed requirements on Zyderm related to design pursuant to the MDA scheme." *King, supra,* at 1134. The court preempted challenges under strict liability, negligence, misrepresentation, and failure to warn. *Id.* at 1135–37. The court split as to the test for preemption of a fraud claim. *Id.* at 1140 (Aldrich, S.J., Campbell, S.J., concurring).

The Fifth Circuit, in considering a state law product liability challenge to a tampon manufacturer, found "no federal regulation on tampon design, composition, or construction. Therefore, we find that the tampon

**2.** 21 C.F.R. § 808.1(b) (1992) states:

Section 521(a) of the [MDA] contains special provisions governing the regulation of devices by States and localities. That section prescribes a general rule that ... no State or political subdivision of a state may establish or continue in effect any requirement with respect to a medical device intended for human use having the force and effect of law (whether established by statute, ordinance, regulation or court decision); which is different from, or in addition to, any requirement applicable to such device under any provision of the act and which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under the act.

21 C.F.R. § 808.1(d) provides that "[s]tate or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements under the act...."

**3.** The court requested supplemental briefs on the issue of the validity of the regulations. Plaintiff's brief focused upon the scope of the regulation concerning design requirements for the hip replacement and did not challenge the regulations.

labeling requirements promulgated pursuant to the statutory scheme regulating medical devices do not preempt plaintiff's state law claims based on the design, composition, and construction of tampons." *Moore,* 867 F.2d at 246.

The Seventh Circuit held that a state law product liability suit against a manufacturer of an intraocular lens was preempted insofar as "It is limited to efforts by states to impose sanctions for compliance with federal regulations relating to the safety or efficacy of the experimental lenses. It does not affect cases charging negligence in the implantation or removal of a lens, or complaining of contamination of the lens by bacteria or fungi or failure to obtain the patient's informed consent to the procedure." *Slater,* 961 F.2d at 1334.

In the case at bar, the relevant regulation is 21 C.F.R. 888.3310(a) which states:

> § 888.3310 **Hip joint metal/polymer constrained cemented or uncemented prosthesis.**
>
> (a) *Identification.* A hip joint metal/polymer constrained cemented or uncemented prosthesis is a device intended to be implanted to replace a hip joint. The device prevents dislocation in more than one anatomic plane and has components that are linked together. This generic type of device includes prostheses that have a femoral component made of alloys, such as cobalt-chromium-molybdenum, and an acetabular component made of ultra-high molecular weight polyethylene. This generic type of device is intended for use with or without bone cement (§ 888.3027). This device is not intended for biological fixation.

21 C.F.R. § 888.3310 (1992).

This regulation plainly discusses the design of hip replacement devices. Plaintiff contends that the discussion of design is insufficiently specific, however, to foreclose his claim. In his supplemental brief he elucidates his point well:

A hip replacement device is made up of three main component parts: a femoral shaft and ball heading, which fits into the femur; a cup which is fitted into the hip bone; and a plastic insert which allows the femoral head to move within the hip cup.

Regulation 21 [C.F.R. §] 888.3310(a) only talks about the composition of the femoral component made of an alloy such as cobalt-chromium-molybdenum. It also talks about the acetabular insert as being composed of an ultra high molecular weight polythethylene. There is no mention in 21 [C.F.R. §] 888.3310(a), or any of the other regulations[,] regarding the composition of the acetabular cup or its porosity. Since there is the complete absence of language dealing with the cup and its porosity, there are no expressed regulations with respect to that component part and Plaintiff's claim cannot be ... preempted....

Plaintiff's Supplemental Brief In Opposition to Defendant's Motion For Summary Judgment 2.

The regulation governing preemption, 21 C.F.R. § 808.1(b) states, however, that any requirement "which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under the act" is preempted. *Id.* Plaintiff's claim concerns the design of the acetabular cup relates to the "safety ... of the device" and to the "other matter" in the design of the hip replacement unit. Therefore, the regulation plainly covers her challenge.

Both the First Circuit and the Seventh Circuits based their reasoning, in part, on the reasonableness of the tradeoff that Congress made in encouraging the use of experimental devices versus the loss of a remedy for a victim of a defective device.[4] The Seventh Circuit opinion focused both on the extensive F.D.A. review process that preceded the introduction of a product to the market, *Id.,* at 1332, and the choice that the plaintiff faced not to try the experimental device

---

4. For unexplained reasons, the First Circuit concurrence referred to victims as the "idiosyncratic few." *King,* at 1137 (Aldrich, S.J., Campbell, S.J., concurring). That term certainly appears inapplicable to the case at bar in which, it has been alleged, the device in question had a 25 percent failure rate and was removed from the market after two years.

when he signed the consent form, *id.*, at 1333–34.

Similarly, the First Circuit devoted considerable length to the nature of "class III" devices, the most experimental and dangerous devices allowed on the market under the M.D.A. "The entire MDA scheme for such Class III devices as Zyderm, therefore, is aimed at determining and regulating the intended purpose of the device, ... Appellant's claim would force us to determine that Zyderm is unsafe and dangerous, in opposition to the contrary determination made by the FDA under the MDA. Subsection (a) protects manufacturers of medical devices approved by the FDA under the MDA from such state law intrusion." *King, supra* at 1135.

The case at bar may also involve a "class III" device.[5] To the extent that the First and Seventh Circuits relied upon the reasonableness of the Congressional decision to remove the common law remedy in order to encourage the use of these devices by manufacturers, that holding could be applicable here as well. This Court remains concerned with the lack of a criterion—such as an analysis under the Seventh Amendment—by which these courts are evaluating the reasonableness of a Congressional policy to foreclose victims' common law rights in exchange for the common good. Therefore, it refuses to join any holding or *dicta* that finds Congress has acted in a wise manner in enacting § 360k.

Since the 21 C.F.R. § 888.3310 plainly applies to the design of the hip replacement parts, the Court finds that it has no basis to exercise discretion in the application of the Congress' and the F.D.A.'s directive to preempt state law challenges to the design of hip replacement devices covered by this regulation. Therefore, the motion is GRANTED and the case is DISMISSED.

SO ORDERED.

---

5. C.F.R. § 888.3310(b) (1992) states that all devices listed under § 888.3310 are class III; however, neither party has represented that the device is a class III device, and the submission for initial approval from the FDA for the device (the "510k submission") states that "total hip prostheses have been recommended for placement in Class II". Dkt. # 7 at 3.