Deborah R. BROWN, Plaintiff,

v.

MEDTRONIC, INC., Defendant.

No. IP93–1065–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

April 7, 1994.

Jerome L. Withered, Christopher D. Corrigan, Reilly Teder Withered & Rush, Lafayette, IN, for plaintiff.

Bonnie L. Gallivan, Kevin R. Knight, Ice Miller Donadio & Ryan, Indianapolis, IN, John W. Bell, Charles W. Planek, Johnson & Bell, Chicago, IL, for defendant.

## MEMORANDUM ENTRY

BARKER, Chief Judge.

This matter came before the Court on defendant's motion for summary judgment. For the reasons stated below, the motion is granted in part and denied in part.

## I. Background

The plaintiff, an Indiana resident, underwent surgery on December 27, 1991, for the implantation of an Itrel II Spinal Cord Stimulation System manufactured by the defendant, a Minnesota corporation. Plaintiff alleges that the system malfunctioned and, as a result, she was forced to undergo two more surgeries and has endured pain and suffering. Consequently, plaintiff initiated the instant action for products liability and negligence in the design, manufacture, sale, and servicing of the Itrel II system. Defendant has moved for summary judgment, arguing that plaintiff's claims are preempted by the Medical Device Amendments of 1976 ("MDA") to the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 321–394.

## II. Discussion

### A. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In passing on a motion for summary judgment, the judge's role is not to evaluate the weight of the evidence or determine the truth of the matter, but it is instead to decide whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment is especially appropriate where the issues in dispute are purely legal, see, e.g., American Jewish Congress v. City of Chicago, 827 F.2d 120, 123 (7th Cir.1987), such as in a question of whether the plaintiff's claims are preempted. In these circumstances, the need for trial is avoided because there are no genuine issues of material fact that must be resolved.

### B. Preemption

Preemption analysis begins with the Constitution's Supremacy Clause, which provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the contrary notwithstanding." Art VI, cl. 2. "[I]t has been settled that state law that conflicts with federal law is 'without effect.'" Cipollone v. Liggett Group, Inc., —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (quoting Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981)).

However, preemption shall not take place unless "it is the clear and manifest purpose of Congress." Id. (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Therefore, "[t]he purpose of Congress is the ultimate touchstone of preemption analysis." Id. (citations omitted).

Congress' intent may be, inter alia, "explicitly stated in the statute's language or implicitly contained in its structure and purpose." Id. (quoting Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)). Congress' intent for preemption is explicitly stated in the MDA:

[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device; and

(2) which relates to the safety or effectiveness of the device or to any other

matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a).[1]

■ Courts must first look to an agency's regulations for guidance concerning the agency's interpretation of its congressional mandate. *Chevron United States, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The FDA, the agency charged with implementing the MDA, has interpreted the language of 21 U.S.C. § 360k(a) in its regulations:

> State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements.

21 C.F.R. § 808.1(d). Additionally, the regulations make clear that the state requirements to be preempted include those "established by ... court decision." 21 C.F.R. § 808.1(b); *see also Slater v. Optical Radiation Corp.*, 961 F.2d 1330, 1333 (7th Cir.1992) (insofar as state tort law requires defendant to do more than required by FDA's regulations, plaintiff's cause of action is preempted, "for it ... unquestionably ... impos[es] in the name of state law a different requirement relating to safety and effectiveness from that imposed by federal law"), *cert. denied*, — U.S. ——, 113 S.Ct. 327, 121 L.Ed.2d 246; *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959) ("[t]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy").

■ Therefore, this Court's inquiry must focus on whether plaintiff's state products liability and negligence causes of action constitute state requirements "different from, or in addition to, the specific ... [FDA] requirements." If the state remedies consti-

tute such, then plaintiff's cause of action is preempted by the MDA.

Under the MDA, a medical device receives one of three classifications, Class I, Class II, or Class III, depending on the level of regulation or control deemed necessary to provide reasonable assurance of the safety and effectiveness of that device. 21 U.S.C. § 360c. The Itrel II System at issue in this case is comprised of three devices which are classified separately: the model 3586 lead, the model 7424 stimulator or implantable pulse generator ("IPG"), and the model 7496 extension. The IPG and extension are Class III devices and the lead is a Class II device.

■ At least two circuits and numerous district courts have addressed the issue of whether state tort causes of action as to Class III devices are preempted by the MDA, and decided in favor of preemption. *King v. Collagen Corp.*, 983 F.2d 1130 (1st Cir.1993), *cert. denied*, — U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52; *Stamps v. Collagen Corp.*, 984 F.2d 1416 (5th Cir.1993), *cert. denied*, — U.S. ——, 114 S.Ct. 86, 126 L.Ed.2d 54; *Bravman v. Baxter Healthcare Corp.*, 842 F.Supp. 747 (S.D.N.Y.1994); *Griffin v. Medtronic, Inc.*, 840 F.Supp. 396 (D.Md.1994): *Kemp v. Pfizer, Inc.*, 835 F.Supp. 1015 (E.D.Mich.1993); *Michael v. Shiley, Inc.*, 1994 WL 59349 (E.D.Pa. Feb. 25, 1994); *Tucker v. Collagen Corp.*, 1994 WL 87367 (N.D.Ill. March 16, 1994). These cases focus upon the premarket approval process required under the MDA for any Class III device to be approved, holding that "the onerous premarket approval process necessary to receive Class III approval constitute[s] an additional requirement under the language of [21 U.S.C. §] 360k and 21 C.F.R. 801.1(d)." *Bravman*, 842 F.Supp. at 757.

In *Slater*, the Seventh Circuit addressed the preemptive effect of the MDA in a case involving a Class III medical device. 961 F.2d 1330. However, the decision in *Slater* was based upon the fact that the device at issue, an intraocular lens, was being regulat-

---

1. There is an exception at 21 U.S.C. § 360k(b) which exempts states from the requirements of § 360k(a). However, neither party has argued that the exception is applicable in the instant case and nothing before the Court indicates that it is.

ed under the MDA's Investigational Device Exemption Regulations. Nevertheless, the reasoning in *Slater* is informative. *Slater* notes that in order for a manufacturer to receive an investigational device exemption, numerous requirements must be met:

A detailed application is required, describing the device and setting forth a plan for studying its use in human subjects ... during the experimental period. 21 C.F.R. § 813.20. The application must be reviewed by an institutional review committee as well as by the FDA before it can be improved. §§ 813.20, 813.30. After approval, the committee has a duty to monitor the clinical investigation.

*Slater*, 961 F.2d at 1332. *Slater* concludes that although there are no MDA requirements specific to the intraocular lenses, the regulations governing the investigational exemption constitute "specific requirements" under the MDA such that state tort claims regarding the device's manufacture or design are preempted:

The FDA decided, whether rightly or wrongly, but pursuant to regulations the validity of which the plaintiff does not question, that the [device] could be sold, subject only to requirements, procedural in character and, so far as appears, fully complied with, designed to assure that this experimental distribution was in fact a worthwhile experiment. The plaintiff wishes in the name of state tort law to impose additional requirements—namely that the [device] have had design characteristics that it lacked—and this engrafting of additional requirements relating to safety or effectiveness is forbidden by the preemption provision in the Medical Devices Amendment.

*Slater*, 961 F.2d at 1333.

While some of the reasoning in *Slater* is clearly related to policy considerations concerning the need to "encourage innovation by exempting promising experimental devices" from usual requirements, *Id.* at 1331–32, *Slater*'s analysis of MDA exemption is also instructive for non-investigational Class III devices. The premarket approval process for Class III devices, similar to the Investigational Device Exemption application, establishes numerous requirements which a manufacturer must meet before receiving approval for a device. "If the MDA does nothing else, it regulates the design, manufacture, sale and marketing of class III medical devices in an extensive way." *King*, 983 F.2d at 1136. This Court, therefore, finds the reasoning of the First and Fifth Circuit, as well as the other district courts that have addressed the issue of preemption for Class III devices, to be persuasive and consistent with the Seventh Circuit's reasoning in *Slater*.

In support of her argument against blanket preemption for Class III devices, plaintiff cites *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1, 837 P.2d 1273 (1992). In *Larsen*, the Hawaii Supreme Court ruled that claims involving a Class III device, a pacemaker, were not preempted under the MDA. However, *Larsen* is distinguishable because the device at issue was excused from the extensive premarket approval process due to the device's substantial equivalency to a device previously on the market:

[a]lthough a determination of substantial equivalence involves a review by the FDA of what is known of the safety and effectiveness of the devices, and may even include some additional clinical testing, it is not equivalent to an approval by the FDA of the device's safety and effectiveness.

*Id.* 837 P.2d at 1282 (citations omitted). Nothing has been presented to the Court in the instant case that would indicate that the Class III devices at issue were similarly excused from regulation.

Plaintiff also argues that preemption should not apply because there are no specific regulations issued for spinal cord stimulation systems. In support of this argument, plaintiff cites *Rinehart v. International Playtex, Inc.*, 688 F.Supp. 475 (S.D.Ind.1988). *Rinehart* is one of a number of cases involving tampons, Class II devices. Courts have regularly held that the MDA only preempts claims made as to Class II devices (which are not subject to the same level of regulation as Class III devices) when specific regulations have been promulgated about the device at issue and, even then, claims are only preempted to the extent the regulations address the aspect of the device at issue (e.g., labeling regulations preempting failure to warn claims). *See Bravman*, 842 F.Supp. at

759 & n. 18. Therefore, as to the Class III devices at issue, plaintiff's argument is unpersuasive.

■ Plaintiff's argument is more persuasive when applied to the Class II device at issue, the lead. Plaintiff points out that defendant's own materials in support of its motion for summary judgment indicate that the lead is a Class II device and was, therefore, not subject to premarket approval. Defendant argues that the lead is still subject to some regulation under the MDA (such as the § 510(k) notification of intent to market). However, the general regulations for Class II devices do not rise to the level to cause preemption under the MDA. *See Elbert v. Howmedica, Inc.*, 841 F.Supp. 327, 330–31 (D.Haw.1993).

Finally, plaintiff contends that Congress did not intend to leave consumers wholly without a remedy for defective medical devices. "Congressional intent, at the time of drafting the MDA, was driven by the growing public outcry against the completely unregulated—and often dangerous—nature of the medical devices market." *Bravman*, 842 F.Supp. at 753 (citing S.Rep. No. 33, 94th Cong., 2d Sess. 3 (1976), reprinted in 1976 U.S.C.C.A.N. 1070, 1071). Congressional intent was also driven by the desire to encourage research and development of medical devices. *Id.* at 754. The MDA reflects a balance between these two concerns. Any reweighing of these concerns must be done by Congress.[2] Furthermore, preemption does not rule out all causes of action relating to a device; for example, preemption "does not affect cases charging negligence in the implantation or removal ... [of a device] ... or of failure to obtain the patient's informed consent to the procedure." *Slater*, 961 F.2d at 1334 (citations omitted).

■ Plaintiff has presented support for her contention that her alleged injuries were caused, at least in part, by the Class II device component (the lead) of the Itrel II System. Plaintiff's medical records indicate that the lead had a broken wire and malfunctioned. Whether and to what extent plaintiff's injuries were caused by the lead is a question of fact. Therefore, to the extent plaintiff's claims are made as to the lead, defendant is not entitled to summary judgment.

III. Conclusion

For the reasons stated above, defendant's motion for summary judgment is granted in part and denied in part. As to all claims relating to the model 7424 stimulator or implantable pulse generator and the model 7496 extension, defendant's motion for summary judgment is granted. As to all claims concerning the model 3586 lead, defendant's motion is denied.[3]

It is so ORDERED.

---

2. We note that some courts, while finding preemption under the MDA, have expressed reservation at stripping consumers of their state tort actions. *See, e.g., Bravman*, 842 F.Supp. at 761; *Cameron v. Howmedica, Inc.*, 820 F.Supp. 317, 321 (E.D.Mich.1993). "It must be recognized that state tort actions, although clearly imperfect, remain a powerful incentive for improving product safety." *Bravman*, 842 F.Supp. at 761 (citation omitted).

3. We note that this holding is consistent with the only other cases we found addressing these same issues with respect to the Itrel II system. *See Murray v. Medtronic, Inc.*, 1993 WL 515741 (E.D.La. Dec. 3, 1993); *Schubert v. Medtronic, Inc.*, 1993 WL 390110 (E.D.La. Sept. 30, 1993).