OPINION OF THE COURT
Stanley L. Sklar, J.
Defendant Medtronic, Inc. moves for permission to amend its answer to add Federal preemption as an affirmative defense to all of plaintiffs’ claims.[1]
PROCEDURAL HISTORY
This action arises out of the death of the infant Kristin Fogal, who was born with a complete heart block, due to a transplacental transfer of her mother’s SLE antibody, requiring the installation of a pacemaker at nine days of life. Kristin died of cardiorespiratory arrest on October 9, 1986. The autopsy report indicated that the cathode lead wires were splayed and showed a loss of insulation housing at the splayed area with fibrous adhesions attached to that area. Mt. Sinai Medical Center and 10 doctors have been sued for medical malpractice in connection with their care and treatment of *500 the infant. In addition, plaintiffs sued Medtronic, Inc., claiming that the lead it had manufactured which was connected to a pulse generator manufactured by former defendant Cordis Corporation was defective.
This action was commenced by service of a summons and complaint on or about March 4, 1988. Plaintiffs’ complaint alleges five causes of action against Medtronic. The eighth cause of action alleges that Medtronic was "negligent in the design, manufacture, inspection, assembly, distribution and placement on the market of the aforesaid pacemakers and aforesaid pacemaker components and parts and failed to warn the infant plaintiff and her parents thereof.” The ninth through eleventh causes of action sound in strict products liability, breach of express and implied warranty; the twelfth cause of action is based on the doctrine of res ipso loquitur and is thus premised on negligence.
Medtronic served an answer to the complaint on or about April 27, 1988. Extensive discovery was undertaken including depositions of the 13 defendants. A note of issue was filed on or about November 3, 1992 and the case set down for trial by the TAP Judge. Medtronic, by motion served about a year after the case was placed on the Trial Calendar, now moves to amend its answer to assert Federal preemption as an affirmative defense to all of plaintiffs’ claims against it. It is Medtronic’s contention that all claims against it are preempted by the Medical Device Amendments to the Federal Food, Drug, and Cosmetic Act (21 USC § 301 et seq.).
THE REGULATORY SCHEME
In 1976 Congress passed the Medical Device Amendments (MDA) to the Federal Food, Drug, and Cosmetic Act (the Act) (21 USC § 360 et seq., added by Pub L 94-295, 90 US Stat 539). The MDA was enacted in response to the rapid technological changes in the medical device field, and the perceived inadequacy of existing law to protect consumers from "increasingly complex devices which pose serious risk if inadequately tested or improperly designed or used.” (S Rep No. 94-33, 94th Cong, 2d Sess 3, reprinted in 1976 US Code Cong & Admin News 1070, 1075.) The MDA was also enacted with the intent of encouraging research and development of medical devices. (Id., at 1071; Bravman v Baxter Healthcare Corp., 842 F Supp 747, 753 [SD NY 1994].)
The MDA established a three-tiered scheme of regulating *501 medical devices. Class I devices are those deemed in need of the least regulatory oversight; tongue depressors are an example. (Stamps v Collagen Corp., 984 F2d 1416, 1418 [5th Cir], cert denied — US —, 114 S Ct 86 [1993].) These devices are subject to the general controls of the Act. (21 USC § 360c [a] [1] [A].) Class II devices are those for which the general controls alone in the Act are not sufficient to provide reasonable assurance of safety and effectiveness, but for which there is sufficient information to establish special controls such as the promulgation of performance standards that assure their safety and effectiveness. (21 USC § 360c [a] [1] [B].) Class II devices include such items as oxygen masks, used in anesthesiology, and tampons. (Stamps v Collagen Corp., supra, at 1418.) Class III devices are those that do not meet the criteria of the first two classes. They are defined as devices that are "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health” or that present "a potential unreasonable risk of illness or injury.” (21 USC § 360c [a] [1] [C] [ii].)
A manufacturer of a Class III device must obtain premarket approval of the United States Food and Drug Administration (FDA) pursuant to the requirements and procedures set forth in 21 USC § 360e to "provide reasonable assurance of its safety and effectiveness.” (21 USC § 360c [a] [1] [C] [ii].) However, a manufacturer may bypass the premarket approval process if it can demonstrate that its device is "substantially equivalent” to a device on the market before May 28, 1976— the effective date of the MDA — and no final regulation has been promulgated under 21 USC § 360e (b) requiring the device to have an approved premarket approval application. (21 USC § 360c [¶] [3]; 21 CFR 814.1 [c].) Such an exemption is obtained by submitting a premarket notification or "510 (k)”[2] application to the FDA 90 days before the manufacturer proposes to introduce the device into interstate commerce. (21 USC § 360 [k]; 21 CFR 807.81.)
In the 1980s[3] a premarket notification for Class III medical devices was required to include all trade, proprietary and common names of the device; the manufacturer’s registration number, proposed labels, labeling and advertisements suffi *502 cient to describe the device, its intended use and the directions for its use; data to support the contention that the device is substantially equivalent to the predicate device; if the device has undergone a significant change that could affect the safety or effectiveness of the device, or the intended use of the device has changed, appropriate supporting data showing that the manufacturer has considered what consequences and effects the change or new use may have on the safety and effectiveness of the device; and any additional information requested by the FDA in order to make a substantial equivalency determination. (21 CFR 807.87.) However, the regulations make clear that submission of a premarket notification or a subsequent determination by the FDA that the device is substantially equivalent to a pre-MDA device "does not in any way denote official approval of the device.” (21 CFR 807.97.)
In 1990 Congress passed the Safe Medical Devices Act (Pub L 101-629, 104 US Stat 4511) to correct various perceived difficulties in the implementation of the MDA. The purpose of the amendment was "to modify the underlying law in ways that [would] result in greater protection of the public health.” (HR Rep No. 101-808, 101st Cong, 2d Sess 14, reprinted in 1990 US Code Cong & Admin News 6305, 6306.) One such problem involved the substantial equivalency exemption for Class III medical devices. As the legislative history of the 1990 amendments noted:
"With enactment of the 1986 Medical Device Amendments, devices already on the market were permitted to remain on the market until the FDA called for a review of their safety and effectiveness. While the 1976 law requires premarket approval of potentially dangerous new medical devices, it also allows new devices that are 'substantially equivalent’ to the old devices to be marketed without being approved for safety and effectiveness until the FDA formally requires reviews of the old devices. None of these reviews of pre-1976 devices even began until very recently * * *
"[0]ver 80 percent of the devices that are potentially the most dangerous (Class III), enter the market on the basis of a claim by the manufacturer that they are 'substantially equivalent’ to a device already on the market. Although a determination of substantial equivalence involves a review by FDA of what is known of the safety and effectiveness of the devices, and may even include some additional clinical testing, it is not equivalent to an approval by the FDA of the device’s safety and effectiveness.” (HR Rep No. 101-808, 101st Cong, 2d Sess *503 14, reprinted in 1990 US Code Cong & Admin News 6305, 6307 [emphasis added].)
The MDA was amended to provide that a device will not be found to be substantially equivalent if the device has different technological characteristics from the predicate device and raises questions of safety and effectiveness that are different from the predicate device or is not as safe and effective as the predicate device. (1990 US Code Cong & Admin News, op. cit., at 6317-6318; 21 USC § 360c [i].) The FDA amended its regulations governing 510 (k) submissions, effective 1992, to require manufacturers to include a "510 (k) summary” of the types of safety and effectiveness problems associated with the devices being compared as well as a "510 (k) statement” certifying that a reasonable search of all information known or otherwise available about the device and similar legally marketed devices has been conducted. (57 Fed Reg 18062, 18066; 21 CFR 807.87 [i].)
THE MEDTRONIC MODEL NO. 4951
According to the affidavit of Dr. Charles H. Swanson, Medtronic’s vice-president of pacing regulatory affairs, the pacemaker lead at issue is a Medtronic epicardial pacing lead and is marketed as the Medtronic model No. 4951. Swanson, relying on 21 CFR 870.3610, which appears to deal with pulse generators rather than with pacemaker leads (see, 21 CFR 870.3680 [b]; 21 CFR 805.3 [d]), asserts that Medtronic model No. 4951 is a product within a device type classified by the FDA as a Class III medical device requiring premarket approval, but that an effective date for premarket approval of pre-MDA pacemaker leads and those found to be substantially equivalent to pre-MDA pacemaker leads has yet to be established by the FDA.
In 1981 Medtronic submitted a premarket notification or 510 (k) submission to the FDA for the model No. 4951 pacemaker lead. The FDA reviewed the application and discussed via telephone Medtronic’s clinical data. After that discussion the model No. 4951 pacemaker lead was cleared for marketing by the FDA on October 23, 1981. The letter informing Medtronic of the approval of its 510 (k) submission states in pertinent part:
"We have reviewed your premarket notification submission and have found the device to be substantially equivalent to devices introduced into interstate commerce prior to May 28, *504 1976, the enactment date of the Medical Device Amendments. You may, therefore, market your device subject to the general controls provisions of the Federal Food, Drug, and Cosmetic Act [Act] * * *
"Existing major regulations affecting your device can be found in the Code of Federal Regulations, Title 21, Part 800. In addition, the [FDA] may publish further announcements concerning your device in the Federal Register * * * Also, the Federal Register will notify you of any additional requirements subsequently imposed on your device * * *
"This letter does not in any way denote official FDA approval of your device or its labeling. Any representation that creates an impression of official approval of this device because of compliance with the premarket notification regulations is misleading and constitutes misbranding.” (Emphasis added.)
LEAVE TO AMEND MEDTRONIC’S ANSWER
Leave to amend an answer pursuant to CPLR 3025 (b) shall be freely granted absent prejudice or surprise to the opposing party, provided the defense is meritorious. (Crimmins Contr. Co. v City of New York, 74 NY2d 166, 170 [1989]; Herrick v Second Cuthouse, 64 NY2d 692, 693 [1984]; Fahey v County of Ontario, 44 NY2d 934, 935 [1978].) Only where the proposed amendment is palpably insufficient as a matter of law or is totally devoid of merit should leave to amend be denied. (Daniels v Empire-Orr, Inc., 151 AD2d 370, 371 [1st Dept 1989]; East Asiatic Co. v Corash, 34 AD2d 432, 434 [1st Dept 1970].)
The fact that Medtronic has moved to amend its answer on the eve of trial is not an absolute bar to granting leave (Norwood v City of New York, 203 AD2d 147 [1st Dept 1994]); amendments may even be made during or after trial (Dittmar Explosives v A. E. Ottaviano, Inc., 20 NY2d 498, 502 [1967]). A court may grant leave to amend pleadings "at any time” (CPLR 3025 [b]); lateness is not a barrier to amendment, it must be lateness coupled with significant prejudice to the other side. (Edenwald Contr. Co. v City of New York, 60 NY2d 957, 959 [1983]; Norwood v City of New York, supra; Detrinca v De Fillippo, 165 AD2d 505, 508 [1st Dept 1991].) In order to demonstrate prejudice plaintiffs must show that they have been hindered in the preparation of their case, that they have been prevented from taking some measure in support of their *505 position (Loomis v Civetta Corinno Constr. Corp., 54 NY2d 18, 23 [1981]; Norwood v City of New York, supra) or that " ' "some significant trouble or expense * * * could have been avoided had the original pleading contained what the amended one wants to add” ’ ” (Barbour v Hospital for Special Surgery, 169 AD2d 385, 386 [1st Dept 1991], citing Armstrong v Peat, Marwick, Mitchell & Co., 150 AD2d 189, 190; Balport Constr. Co. v New York Tel. Co., 134 AD2d 309, 312 [2d Dept 1987]).
Plaintiffs rely on Fleet Factors Corp. v Van Dorn Retail Mgt. (180 AD2d 556, 557 [1st Dept 1992]) to support their argument that the proposed amendment comes too late. However, in Fleet leave to amend a third-party answer was denied not only because it was made more than one year after the completion of discovery and on the eve of trial, but because no viable explanation was proffered for the delay, and there was prejudice to the third-party plaintiff. Here, there was no case law to support giving Federal preemption to Class III medical devices subject to clearance upon a 510 (k) submission until relatively recently. More importantly, plaintiffs have failed to establish prejudice as a result of the proposed amendment.
Plaintiffs’ only complaint is that this case is on the eve of trial and they have been prevented from conducting discovery with respect to the issue of Federal preemption. Plaintiffs do not urge that had the defense been earlier asserted the bulk of the discovery conducted would have been obviated. Although this case is on the Trial Calendar Medtronic observes that plaintiffs have yet to respond to its request for expert information. Medtronic therefore concludes that the plaintiffs are not truly ready for trial.
While it is true that the depositions of all 13 defendants have already been concluded, it is equally true that the defense of preemption would not involve recalling all of these witnesses. At oral argument, counsel for Medtronic indicated that it was willing to produce the necessary witnesses for an examination before trial as well as produce the contents of its 510 (k) submission and any other needed discovery raised by the defense. Plaintiffs do not claim that any necessary material has become unavailable because of the passage of time. Therefore, assuming the court finds merit to this defense, any prejudice to plaintiffs can be alleviated by permitting plaintiffs to conduct further, limited discovery related to the newly raised defense. (Risucci v Homayoon, 122 AD2d 260, 262 [2d Dept 1986].) I note in any event that the defense of preemp *506 tian constitutes a challenge to the court’s subject matter jurisdiction (see, e.g., Thomas v Best, 104 AD2d 37, 40 [3d Dept 1984]) which can be raised at any time, even at the appeal (Marine Midland Bank v Bowker, 89 AD2d 194, 195-196 [3d Dept 1982], affd 59 NY2d 739 [1983]; Lacks v Lacks, 41 NY2d 71, 74-75 [1976]; Gomez v Gomez, 86 AD2d 594 [2d Dept 1982], affd 56 NY2d 746). The court now examines the merit of Federal preemption as a defense to the plaintiffs’ claims against Medtronic.
FEDERAL PREEMPTION
The Supremacy Clause of the Constitution invalidates State laws that interfere with or are contrary to Federal law. (US Const, art VI, cl [2]; Cipollone v Liggett Group, 505 US —, 112 S Ct 2608, 2617 [1992].) Congressional intent is the touchstone of any preemption analysis. (Supra; Shaw v Delta Air Lines, 463 US 85, 95 [1983]; Malone v White Motor Corp., 435 US 497, 504 [1978].) Congress may express its intent to preempt State law explicitly in the language of the statute (Jones v Rath Packing Co., 430 US 519, 525 [1977]), or impliedly by passing a statutory scheme that extensively covers the field of regulation. (Fidelity Fed. Sav. & Loan Assn, v de la Cuesta, 458 US 141, 153 [1982].) As the Supreme Court recently made clear, "Congress’ enactment of a provision defining the preemptive reach of a statute implies that matters beyond that reach are not pre-empted.” (Cipollone v Liggett Group, supra, at —, at 2618.)
Here, we are dealing with a case of express preemption. (Stamps v Collagen Corp., supra, at 1420.) The MDA contains a provision expressly addressing its intended preemptive scope:
"[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
"(1) which is different from, or in addition to, any requirement applicable under this Act to the device, and
"(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this Act.” (21 USC § 360k [a].)
Thus, all State requirements pertaining to medical devices regulated under the MDA are not preempted; only those which are different from or in addition to counterpart or specific requirements applicable to the device under the Act. (Moore v Kimberly-Clark Corp., 867 F2d 243, 244-245 [5th Cir 1989].) The FDA made this clear when it promulgated 21 CFR *507 808.1 (d) which provides in pertinent part: "State and local requirements are preempted only when the [FDA] has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific [FDA] requirements. There are other State or local requirements that affect devices that are not preempted by section 521(a) of the act because they are not 'requirements applicable to a device’ within the meaning of section 521(a) of the act” (emphasis added).
The regulation then goes on to list "examples” of State or local requirements that are not preempted. The Act does not preempt such requirements "that are equal to, or substantially identical to, requirements imposed by or under the act.” (21 CFR 808.1 [d] [2].) "Substantially identical to refers to the fact that a State or local requirement does not significantly differ in effect from a Federal requirement.” (21 CFR 808.3 [f].) "Section 521(a) does not preempt State or local requirements respecting general enforcement * * * However, Federal regulations issued under * * * the act may impose requirements for records and reports and good manufacturing practices beyond those prescribed in State or local requirements. If there is a conflict between such regulations and State or local requirements the Federal regulations shall prevail.” (21 CFR 808.1 [d] [6] [i].)
In addition, section 521 (a) does not in general preempt "State and local requirements prohibiting the manufacture of adulterated or misbranded devices,” unless such prohibition results in the imposition of a "substantive” requirement for the device different from or in addition to a "Federal requirement established under the act” such as a "specific labeling requirement.” (21 CFR 808.1 [d] [6] [ii].)
Several Federal courts have ruled that certain State law claims based on the malfunctioning of Class III medical devices are preempted by the MDA. (Stamps v Collagen Corp., supra, at 1416 [collagen treatments]; King v Collagen Corp., 983 F2d 1130 [1st Cir], cert denied — US —, 114 S Ct 84 [1993] [collagen treatments]; Michael v Shiley, Inc., 62 USLW 2608, 1994 WL 59349 [ED Pa 1994] [heart valve prosthesis]; Kemp v Pfizer, Inc., 835 F Supp 1015 [ED Mich 1993] [heart valve prosthesis].) However, in each of these cases the medical device at issue was required to and did undergo the full premarket approval process and had been given premarket *508 approval by the FDA.[4] Here, in contrast, the Medtronic model No. 4951 was merely cleared for marketing pursuant to a 510 (k) submission. As noted by the Fifth Circuit in Stamps, the two approval processes are very different:
flLarsen is distinguishable from the instant case in that it involved a device that passed through a less stringent Class III review process by virtue of its being 'substantially equivalent’ to devices already allowed to be marketed * * *
"The instant devices are not 'substantially equivalent’ to marketable devices; rather, they have been subjected to the full rigor of the [premarket approval] process” (supra, 984 F2d, at 1423, n 6).
The case referred to by the Fifth Circuit is Larsen v Pacesetter Sys. (74 Haw 1, 837 P2d 1273 [1992]). In Larsen the Supreme Court of Hawaii ruled that a patient’s claim for breach of implied warranty of merchantability arising from the recall of a "substantially equivalent” Class III pacemaker was not preempted by the MDA. Citing the legislative history of the 1990 amendments to the MDA the Supreme Court noted that a determination of substantial equivalence by the FDA is not equivalent to a premarket approval by the FDA of the device’s safety and effectiveness (74 Haw, 837 P2d, at 1282). As noted above, the MDA was amended in 1990 to clarify the statutory basis for examining safety and effectiveness in making determinations that two devices are substantially equivalent. (1990 US Code Cong & Admin News, op. cit, at 6306.) Accordingly, a finding by the FDA of substantial equivalency prior to 1990 did not necessarily mean that the device was safe and effective. Thus "meritorious claims of the type brought by plaintiff would not contravene FDA 'approval’ of the device and would further Congressional intent by providing pacemaker manufacturers a product safety incentive in those areas where the premarket approval process has failed adequately to protect the consumer” (74 Haw, at 16, 837 P2d, at 1282).
*509 Likewise, in Oja v Howmedica, Inc. (848 F Supp 905 [D Colo 1994]), the District Court ruled that State tort claims based upon a medical device cleared for marketing pursuant to the 510 (k) premarket notification procedure were not preempted by the MDA. Other courts disagree. In Mendes v Medtronic, Inc. (18 F3d 13 [1st Cir 1994]) the recipient of a Medtronic pacemaker (model No. 5984LP) brought suit against the company after the pacemaker failed. Similar to the case at bar, the pacemaker in Mendes had been marketed by Medtronic since 1981 without premarket approval because no regulation specifically required premarket approval and because the FDA found the pacemaker to be substantially equivalent to preMDA pacemakers. The First Circuit found that the negligence and warranty claims based on inadequate warnings and a manufacturing defect were barred because the FDA regulated the content and appearance of prescription medical device labels, including pacemaker labels, and promulgated regulations on good manufacturing practices.
Because the Medtronic model No. 4951 did not undergo a full premarket approval process, Stamps (supra), King (supra) and other cases finding preemption under the MDA for State claims based on Class III products that have undergone the premarket approval process may be distinguishable.* ***[5] As discussed above, the courts are divided on whether claims based on medical devices cleared for marketing pursuant to a 510 (k) submission are preempted by the MDA. However, to give proper regard to the Supreme Court’s teachings about Fed *510 eral-State comity in Cipollone (supra), the court must examine each of the plaintiffs’ claims[6] to determine whether their resolution would establish or perpetuate any requirements under the common law differing from or adding to the requirements of the MDA for the Medtronic model No. 4951. (King v Collagen Corp., 983 F2d 1130, 1135 [1st Cir], cert denied — US —, 114 S Ct 84 [1993], supra; Michael v Shiley, Inc., 62 USLW 2608, 1994 WL 59349, supra.) In conducting this analysis the court is mindful that Medtronic’s reading of the MDA effectively denies plaintiffs access to a State law damages action as a remedy for the injuries sustained by the infant and that there is a strong presumption against preemption of State law remedies. (Cipollone v Liggett Group, supra, at 2618.)
In New York three types of product "defects” can expose manufacturers to liability: (1) absence or inadequacy of warnings accompanying a product which causes harm; (2) mistakes in manufacturing which render a product dangerous and cause harm; and (3) defects in design. (86 NY Jur 2d, Products Liability, § 12.) Here, plaintiffs have alleged that the Medtronic model No. 4951 pacemaker lead was defective in all three of these ways, and liability is predicated on theories of negligence, breach of warranty as well as strict liability in tort.
BREACH OF WARRANTY
Medtronic’s application to add preemption as a defense to the plaintiffs’ warranty claims is denied. 21 CFR 808.1 (d) (1) specifically provides that section 521 (a) of the Act (21 USC § 360k [a]) "does not preempt State or local requirements of general applicability where the purpose of the requirement relates * * * to other products in addition to devices (e.g., requirements such as * * * the Uniform Commercial Code (warranty of fitness)).” In addition, 21 CFR 805.10 (g), (h) and 805.3 (h) appear to recognize express and implied warranties "under contract or State law” relating specifically to pacemakers and pacemaker leads. In addition, the Supreme Court in *511 Cipollone (505 US —, —, 112 S Ct 2608, 2622, supra) held that an express warranty was not preempted since it was not " 'imposed under State law,’ but rather [was] imposed by the warrantor. ” (See also, Ministry of Health v Shiley, Inc., 858 F Supp 1426 [CD Cal 1994]; but see, King v Collagen Corp., supra, at 1135.)
FAILURE TO WARN
Plaintiffs’ claims based on a failure to provide adequate warning are not preempted. Medtronic claims that because the lead was subject to the labeling requirements of 21 CFR 801.109 (c) and (d),[7] all claims regarding labeling and warnings are preempted. The court does not agree. 21 CFR 808.1 (d) (6) (ii) indicates that State and local requirements prohibiting the manufacture of misbranded devices are not preempted unless the prohibition "has the effect of establishing a substantive requirement for a specific device” that is different from or in addition to a requirement established under the Act. Under the Act a device is misbranded inter alla "[i]f its labeling is false or misleading in any particular” or its labeling bears inadequate directions for use. (21 USC § 352.) Neither the Act nor the regulations prescribe any specific labeling requirements for the lead as is the case, for example, with tampons (see, 21 CFR 801.427, 801.430; Moore u Kimberly-Clark Corp., supra, at 247; Lulov v Tambrands, 198 AD2d 479 [2d Dept 1993]). In addition, unlike products that go through the premarket approval process where there is extensive oversight concerning the content of labeling (see, e.g, 21 USC § 360e [d] [A], [B], CD]; 21 CFR 814.44 [d], [e] [1] [i]; 814.80, 814.82 [a] ), the FDA does not approve the content of labeling on a 510 (k) submission. As previously noted, the FDA’s letter to Medtronic indicated that the letter did "not in any way denote official FDA approval of your device or its labeling.”
The labeling requirements relied upon by Medtronic (21 CFR 801.109 [c], [d]) are general requirements, the violation of which would not preempt any claims of inadequate warnings based on State law since they would not constitute different or additional requirements. I further note that since the Act and regulations permit a "judicial” finding that the predicate device, which also has not gone through premarket approval process, has been misbranded (see, 21 USC § 360c [i] [2]; 21 *512 CFR 807.100 [b] [3]) strongly suggests that the issue of the adequacy of the warnings or the labeling of a substantially equivalent device is not preempted. Thus the failure to warn cases involving devices that have gone through the premarket approval process (see, e.g., Stamps v Collagen Corp., supra, at 1422; Bravman v Baxter Healthcare Corp., supra, 842 F Supp, at 760-761 [SD NY 1994]) are inapposite.
To the extent that cases such as Mendes (supra) hold that all claims based on inadequate warning are preempted, I decline to follow them.
MANUFACTURING DEFECT
Plaintiffs also claim that the Medtronic model No. 4951 pacemaker lead which was implanted in the infant was negligently and defectively manufactured. The FDA has placed requirements on the manufacturing of pacemaker devices by way of the general "good manufacturing practices” applicable to all classes of medical devices intended for human use, including Class I (21 USC § 360c [a] [1] [A]) and Class II devices (21 USC § 360c [a] [1] [B]; see, 21 USC § 360j [f]; 21 CFR part 820; exhibit A, FDA’s letter of substantial equivalence ["Class I devices are regulated by the general control provisions of the Act applicable to all medical devices including * * * good manufacturing practices”]). It is evidently upon these general practices which Medtronic relies for its claim of preemption, asserting that plaintiffs’ manufacturing claims could seek to apply manufacturing practices different from or in addition to those set forth in the FDA’s requirements. Medtronic, while claiming that the FDA’s requirements for 510 (k)s are more rigorous for Class III devices than for Class I and Class II devices, concedes that "the 510(k) process is not as comprehensive as that imposed through the pre-market approval process” (Bakalor reply affidavit, at 8). Medtronic apparently further claims that plaintiffs’ strict liability claim based on a manufacturing defect may also be preempted because under New York law "Medtronic could be found liable even if it meticulously followed FDA’s good manufacturing practices.” (Mendes v Medtronic, Inc., supra, at 19; but see, Moore v Kimberly-Clark Corp., supra.)
Plaintiffs assert that their manufacturing claims are not preempted since there are no specific manufacturing requirements applicable to the device in issue. The court agrees and therefore denies that branch of Medtronic’s motion which *513 seeks to add a preemption defense relating to plaintiffs’ manufacturing claims.
As previously noted, all classes of devices are subject to the general good manufacturing practices set forth at 21 CFR part 820. In cases involving Class II devices the courts have routinely rejected the claim of preemption with respect to manufacturing defects, notwithstanding the applicability of these general good manufacturing practices. (See, Moore v Kimberly-Clark Corp., supra, at 244-246; Brown v Medtronic, Inc., 852 F Supp 717, 721 [SD Ind 1994]; Elbert v Howmedica, Inc., 841 F Supp 327 [D Haw 1993]; Murray v Medtronic, Inc., 1993 WL 515741 [ED La 1993]; Northrip v International Playtex, 750 F Supp 402 [WD Mo 1989]; Bejarano v International Playtex, 750 F Supp 443, 445-446 [D Idaho 1990]; see also, Rinehart v International Playtex, 688 F Supp 475 [SD Ind 1988].) These courts, relying on 21 CFR 808.1 (d), have observed that "[s]tote or local requirements are preempted only when the [FDA] has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act,” and that general requirements therefore do not amount to specific requirements.
While several cases have held that certain (see, Reiter v Zimmer, Inc., 830 F Supp 199, 202, n 4, 204 [SD NY] [manufacturing claims alleging that the defendant did not comply with its own FDA approved manufacturing specifications set forth as conditions for FDA approval of a premarket approval application are not preempted]) manufacturing claims involving Class III devices are preempted, these cases involved devices which were subject to premarket approval process. (See, Stamps v Collagen Corp., supra; King v Collagen Corp., supra.) As contrasted with the premarket notification submission (see, 21 CFR 807.92), the premarket approval application (PMA) must contain a complete description of the manufacturing methods and controls used so that it can be determined whether these controls and methods are adequate. (21 CFR 814.20 [b] [4] [v]; 21 USC § 360e [c] [1] [C]; [d] [2] [C].) The FDA substantively reviews the PMA (21 CFR 814.44 [a]) and can set forth conditions for approval in its "approvable letter” including, for example, an inspection that finds that the applicant’s specific manufacturing facilities, methods and controls are in compliance with the general good manufacturing practices set forth in part 820. The regulations further provide that "[a] device may not be manufactured * * * in a manner that is inconsistent with any conditions to approval specified in the *514 PMA approval order for the device” (21 CFR 814.80), and that after approval the PMA applicant must allow the FDA to inspect, copy and verify the applicant’s records and permit the FDA to inspect the manufacturing facilities to ensure that the device among other things is being manufactured under approved conditions (21 CFR 814.82 [b]). The FDA must deny approval of a PMA if it is found that the specific manufacturing methods, controls or facilities do not conform to the agency’s good manufacturing practices. (21 USC § 360e [d] [2] [C].) After approval by the FDA of a PMA the applicant must submit to the FDA a supplement if there are changes in the manufacturing facilities, methods or quality control procedures which affect the safety or effectiveness of the device. (21 CFR 814.39 [a] [4]; see also, 21 CFR 814.39 [d] [1] [iv].)
Thus in Stamps (supra, at 1419, 1422) the court, in holding that the manufacturing claims were preempted, observed that the PMA process required the FDA’s scrutiny and approval of the applicant’s specific manufacturing methods. Similarly, in King (supra, at 1131, 1136) the court held that the manufacturing claims were preempted because the premarket approval process required the applicant to submit descriptions of manufacturing methods and materials which were extensively reviewed by the FDA before any approval was given. Since a determination of substantial equivalency under the premarket notification procedure does not lead to "approval” of the device, the rationale of these two cases is inapplicable.
To the extent that the First Circuit extended its conclusion reached in King (supra) to the Mendes case (supra) based solely on the general good manufacturing practices applicable to all devices set forth in 21 CFR part 820, I decline to follow it. (See, Oja v Howmedica, Inc., 848 F Supp 905 [D Colo 1994], supra.) When a product has gone through the PMA process and has been approved, the FDA is essentially indicating that it has reviewed specific manufacturing practices and finds them to be adequate vis-á-vis the safety and effectiveness of the device. Thus if a claimant urges in the case of a device that has undergone the PMA process that additional or different controls or practices are necessary other than those approved by the FDA, the cases have held that preemption will occur. In that situation the purposes of the PMA will be served, namely to protect the public while encouraging research and development of mechanical devices by not subjecting each device to a wide variety of State and local require *515 ments different from or in addition to the specific Federal requirements.
These purposes will not be served in the case of a Class III device which has gone through the premarket notification process where the only regulations applicable are general, nonspecific, good manufacturing practices and where the FDA has not approved the device.
While Medtronic, in its reply declaration of Charles Swanson, details for the first time various categories of information including "controls used for the manufacture of the leads,” which had to be supplied by Medtronic in connection with its application for an investigational device exemption, there is no indication that any particular manufacturing practice was a condition of approval for Medtronic’s clinical study, or that once the clinical study was concluded any requirement imposed during that study continued. Only upon completion of the study did Medtronic file its 510 (k) submission. Accordingly, the plaintiffs’ manufacturing claims are not preempted.
DESIGN DEFECT
This court rules that the claim that the pacemaker lead was defectively designed is not preempted by the MDA. (Larsen v Pacesetter Sys., supra, at 1282.) First, there are no specific FDA regulations governing the design of this device (Moore v Kimberly-Clark Corp., supra, at 246-247 [State tort law claims alleging defective design of tampons not preempted by MDA where no Federal regulations existed governing the same]). Second, the FDA’s permission to market the device was not an approval of the safety or effectiveness of this pacemaker lead. As previously indicated, 21 CFR 807.97 recites that a determination of substantial equivalency does not "denote official approval of the device.” This was reaffirmed in the FDA’s letter to Medtronic finding the pacemaker lead in question to constitute the substantial equivalent of prior devices. Unlike the collagen injections in Stamps (supra) and King (supra), or the heart valve prosthesis in Michael (supra), the FDA merely indicated that the Medtronic model No. 4951 pacemaker lead was substantially equivalent to a pre-MDA pacemaker lead, which also had not been subjected to any sort of FDA approval.
Medtronic also relies on Mendes (supra), Griffin v Medtronic, Inc. (840 F Supp 396 [Md 1994]), and Bollier v Medtronic, Inc. (1993 WL 734843, SD Tex 1993, Black, Ch. J. [motion for *516 reconsideration denied Dec. 20, 1993]) to support Federal preemption of plaintiffs’ claim that the Medtronic model No. 4951 was defectively designed. In Mendes the plaintiff had abandoned her design defect claim and thus the First Circuit did not rule on this precise issue. It is unclear that the claims held to be preempted in the Griffin case included a claim that the pacemaker was defectively designed. In any event, as discussed above, because these pacemakers did not undergo the full pre-market approval process and thus the FDA never in effect passed upon the safety or effectiveness of these medical devices, I decline to follow the Bollier court’s ruling that design defect claims were preempted. For these reasons the court finds that the plaintiffs’ claims based on defective design are not preempted by the MDA.
For the above reasons Medtronic’s motion is denied.

. Defendant Cordis Corporation’s cross motion to amend its answer to add Federal preemption as an affirmative defense has been withdawn since a prior motion by Cordis for summary judgment dismissing the plaintiffs’ claims against it was granted without opposition on January 3, 1994. In addition, Medtronic by stipulation, dated May 6, 1994, discontinued its cross claims against Cordis.

. Referring to section 510 (k) of the Act, codified as 21 USC § 360 (k).

. In 1990 Congress passed the Safe Medical Devices Act (Pub L 101-629) to improve perceived problems with the MDA.

. It must be noted that the Fifth Circuit ruling in Stamps (supra) that manufacturing defect claims relating to Class III devices were preempted because of, inter alla, the FDA’s good manufacturing practice requirements (21 USC § 360j [f]; Stamps v Collagen Corp., supra, at 1422, n 5) appears to be inconsistent with the Fifth Circuit’s earlier ruling in Moore v Kimberly-Clark (867 F2d 243 [1989], supra) which held that State claims regarding design, construction and composition of tampons, a Class II device, were not preempted because there were no specific FDA requirements applicable to the device, even though such devices were also subject to the FDA’s good manufacturing practices (see, 21 USC § 360c [a]; § 360j [f]; 21 CFR 820.1).

. Even where devices undergo the full premarket approval process, criticisms have been leveled against Federal preemption of products liability claims under the MDA. As one commentator recently noted:
"The New York Times of March 5, 1993, contained an article where Bruce Burlington, described as the chief of the Center for Medical Devices for the
[FDA], stated that certain safety tests and applications approving medical products, including heart defibrillators, were so poorly carried out that they were 'not up to the level of fifth grade science’ * * *
"Prudential Securities Research Report by Barbara T. Dreyfuss dated Jan. 5, 1993, indicates that the FDA has a serious backlog of products awaiting approval and that there is a concern that the FDA device-review standards were not stringent enough. The report also indicates that the FDA has a serious staff shortage.
"In light of this, one must wonder, as pointed out in a prior column, why the courts appear to ignore what Wall Street and the New York Times clearly know: that the mere fact that a product or medical device is approved by the FDA does not automatically mean it is safe.” (Schlesinger, Products Liability: Plaintiff’s Alleged Misuse of Defective Item, NYLJ, Mar. 16, 1994, at 3, col 1, at 7, cols 2-3 [Real World, FDA, Courts].)

. It is clear that 21 USC § 360k (a) applies to requirements established under a State’s common law. (21 CFR 808.1 [b]; Cipollone v Liggett Group, supra, at 2620; Stamps v Collagen Corp., supra, at 1420-1421; Slater v Optical Radiation Corp., 961 F2d 1330 [7th Cir], cert denied — US —, 113 S Ct 327 [1992]; Michael v Shiley, Inc., 62 USLW 2608, 1994 WL 59349 [ED Pa 1994], supra; see also, Lulov v Tambrands, 198 AD2d 479 [2d Dept 1993], supra [products liability action against tampon manufacturer preempted by MDA].)

. There is no claim that the exemptions set forth in 21 CFR 801.109 (c) and (d) apply.